In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 16-4168

JOSEPH R. ELLIOTT,

*Plaintiff-Appellee,*

*v.*

BOARD OF SCHOOL TRUSTEES
OF MADISON CONSOLIDATED SCHOOLS,

*Defendant-Appellant,*

and

STATE OF INDIANA,

*Intervenor-Appellant.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 13-cv-319 — **William T. Lawrence**, *Judge.*

———————————

ARGUED SEPTEMBER 6, 2017 — DECIDED DECEMBER 4, 2017

———————————

Before BAUER, EASTERBROOK, and HAMILTON, *Circuit
Judges.*

HAMILTON, *Circuit Judge*. The Contract Clause of the United States Constitution prohibits States from passing laws "impairing the Obligation of Contracts." Art. I, § 10, cl. 1. The prohibition is not absolute, but it imposes substantial limits on laws that would undermine existing contractual rights. In 2012, an Indiana law took effect amending the State's teacher tenure law to cut back on the rights of tenured teachers in layoffs. The issue in this appeal is whether the new law violates the Contract Clause rights of a teacher who had tenure before the law took effect.

The Supreme Court of the United States held in 1938 that the Indiana teacher tenure statute created contractual rights protected by the Contract Clause. *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 104 (1938). From 1927 to 2012, that contract included job security when school districts needed to reduce their teaching staffs: as long as they were qualified for an available position, tenured teachers had a right to be retained over non-tenured teachers. The new Indiana law eliminates that right and orders school districts to base layoff choices on performance reviews without regard for tenure status.

In 2012, defendant Board of Trustees for Madison Consolidated Schools relied on the new law to lay off plaintiff Joseph Elliott, a teacher who earned tenure fourteen years before the new law took effect, while it retained non-tenured teachers in positions for which Elliott was qualified. Elliott sued, claiming that the amendment violated the Constitution when applied to him. The district court granted summary judgment in Elliott's favor. *Elliott v. Board of School Trustees of Madison Consol. Schools*, 2015 WL 1125022 (S.D. Ind. March 12, 2015). We affirm.

I.  *Legal and Factual Background*

   A.  *Indiana's Teacher Tenure Law*

Indiana enacted its teacher tenure law as the Act of March 8, 1927, Laws of the State of Indiana 259–62 (1927) ("the Act"). The Act established how and when a teacher earns tenure, the "principal purpose" of which is "to secure permanency in the teaching force." *Watson v. Burnett*, 23 N.E.2d 420, 423 (Ind. 1939). Permanency was intended to promote "the public good through the creation of a competent cadre of teachers in the state." *Stewart v. Fort Wayne Community Schools*, 564 N.E.2d 274, 278 (Ind. 1990). With the enactment, Indiana joined a national trend in the early twentieth century of offering job security to attract better teachers.

Unlike tenure statutes in many other States, Indiana's law has been treated as forming "an employment by contract between the teacher and the school corporation." *School City of Elwood v. State ex rel. Griffin*, 180 N.E. 471, 474 (Ind. 1932); see also *Anderson*, 303 U.S. at 107 (distinguishing Indiana law from other States' laws). A teacher who had "serve[d] under contract as a teacher in any school corporation in the State of Indiana for five or more successive years" achieved tenure upon entering a sixth successive one-year contract. Ind. Code § 26-6967.1 (1927).[1] Once tenured, teachers have an "indefinite contract" that entitles them to employment contracts each year unless the employer has good cause to fire them. *Id.*; *Lost Creek School Township v. York*, 21 N.E.2d 58, 64 (Ind. 1939). The annual employment contracts can adjust variable terms like salary, hours, and the length of the school year, but they must

---

[1] The original Act referred to "permanent" teachers, but we use the more common term "tenured."

always comply with the Act. *Lost Creek*, 21 N.E.2d at 64. In case of a conflict, the indefinite contract terms set by statute supersede the annual employment contract. *School City of Lafayette v. Highley*, 12 N.E.2d 927, 930 (Ind. 1938) (parties cannot circumvent Act by relying on written contract).

The core terms of the Act limit the reasons and procedures for firing or laying off tenured teachers. To cancel a tenured teacher's contract, a school must provide written notice and, upon demand, a comprehensive hearing before the school board. Ind. Code § 20-28-7.5-2; Ind. Code § 26-6967.2 (1927). Schools can fire tenured teachers only for incompetence, insubordination, neglect of duty, immorality, a justifiable decrease in the number of teaching positions, or other good cause. Ind. Code § 20-28-7.5-1; Ind. Code § 6967.2 (1927). Recognizing a possible loophole, Indiana courts have long held under the Act that if a school district must reduce the number of its teachers, the district must retain qualified tenured teachers over non-tenured teachers. *Watson*, 23 N.E.2d at 423.

B. *Senate Bill 1*

The job security provisions in Indiana's tenure law remained unchanged until 2011. Compare Ind. Code § 26-6967.1 (1927) with Ind. Code § 20-28-7-1 (2010); and Ind. Code § 26-6967.2 (1927) with Ind. Code § 20-28-7-2 (2010). In 2011, Indiana amended the Act through Senate Bill 1, which took effect in 2012. As relevant here, Senate Bill 1 established a mandatory teacher-evaluation regime and removed the protection for tenured teachers in layoffs.[2]

---

[2] Senate Bill 1 also changed the terminology from "permanent teacher" to "established teacher." Any difference between the two labels is irrelevant here, so we continue to use the general term "tenured."

Starting with the 2012–13 academic year, Senate Bill 1 requires schools to implement annual teacher-evaluation plans. Ind. Code § 20-28-11.5-4(a). Each year, schools must assess their teachers based on performance evaluations, "Objective measures of student achievement and growth," and "Rigorous measures of effectiveness." Ind. Code § 20-28-11.5-4(c). Schools must then assign each teacher a rating: highly effective, effective, improvement necessary, or ineffective. Ind. Code § 20-28-11.5-4(c)(4).

These annual evaluations affect teacher pay, student placement, and—most relevant here—selection of teachers for layoff during reductions in force. Under Senate Bill 1, a school district may no longer consider tenure status when reducing its teaching staff. Schools laying off teachers must now cancel teacher contracts "on the basis of performance rather than seniority." Ind. Code § 20-28-7.5-1(d). To decide between teachers with the same performance ratings, schools may consider other factors, including experience, additional degrees or credit hours, leadership roles, and the school's academic needs. Ind. Code §§ 20-28-7.5-1(d), 20-28-9-1.5(b).

C. *Plaintiff's Employment History*

Plaintiff Joseph Elliott taught at Dupont Elementary School, part of Madison Consolidated Schools, for nineteen years. In 1998, Elliott entered his sixth successive contract with the school district and became a tenured teacher under the Act. He continued to teach at Dupont for fourteen more years. As is the norm in Indiana, Elliott signed a series of annual contracts, the last of which was for the 2011–12 school year. In 2012, Elliott's colleagues elected him president of the local teachers union.

During Elliott's time at Dupont Elementary, the school's evaluation policy assessed teachers across fourteen skills. Elliott received ten of these evaluations. In all but one, he received ratings of "strength" or "satisfactory"—the two highest ratings—in all fourteen skills. The exception was 2002, ten years before he was laid off, when he received "needs improvement" in the three skills related to "interpersonal relationships" and a comment that he sometimes had "difficulty accepting, graciously, a different point of view." In a few more recent evaluations, Elliott received critiques about his interpersonal skills but always earned ratings of satisfactory or above. Dupont evaluated Elliott for the last time in 2012 and found him satisfactory or better in all skills. Toward the end of the 2011–12 school year, Dupont's principal reviewed the evaluation and recommended Elliott for contract renewal.

D. *Defendant's 2012 Layoffs*

In the summer of 2012, however, the Madison school district faced declining enrollment and a corresponding reduction in state funding. The district decided to close two schools and to reduce its teaching staff effective that fall. The district had recently implemented a new retention policy that incorporated Senate Bill 1. Since we are reviewing a grant of summary judgment for plaintiff, we assume that the district properly followed that policy (though Elliott disputes the point). Elliott and five other teachers were notified that the district was laying them off.

As Indiana law provided, Elliott demanded a conference with the superintendent and then a full hearing with the Board. After the hearing, the Board made factual findings about Elliott. The findings in 2012 pointed to the 2002 evaluation that had rated Elliott low in interpersonal-relationship

skills. The 2012 findings also cited a few comments from evaluators over the years suggesting that Elliott could be more compassionate. The Board also concluded that Senate Bill 1 allowed the district to cancel Elliott's contract during a justifiable reduction in force. The Board ordered Elliott's contract cancelled as of the end of the 2011–12 school year. The school district retained six non-tenured teachers in positions that Elliott was licensed to teach.

E. *Procedural History*

Elliott sued the school district in state court in January 2013 alleging four state-law claims: (1) that Senate Bill 1 violated the Indiana Constitution; (2) that the district applied Senate Bill 1 before its effective date; (3) that the district applied Senate Bill 1 incorrectly; and (4) that his layoff was not supported by sufficient evidence. He also alleged that Senate Bill 1 impaired his contractual rights in violation of the United States Constitution. The Board removed the case to the federal district court, and the State of Indiana later intervened to defend the new law's constitutionality. See 28 U.S.C. § 2403(b). The parties filed cross-motions for summary judgment, and the district court ruled in favor of Elliott.

The district court concluded that the layoff provisions of Senate Bill 1 violate the Contract Clause when applied retroactively to a teacher like Elliott who earned tenure before the new law took effect. Applying Supreme Court and Indiana precedent, Judge Lawrence concluded that tenured Indiana teachers have contractual rights to be retained over non-tenured teachers in a reduction in force. He then found that Senate Bill 1 "completely destroyed" this right and was a substantial impairment under the Contract Clause. Finally, he rejected the argument that this impairment was constitutionally

permissible as a reasonable and necessary exercise of the State's power.

The State and the Board sought permission to take an interlocutory appeal under 28 U.S.C. § 1292(b). The district court granted permission but we did not. The district court then entered final judgment for Elliott and awarded him back pay under 42 U.S.C. § 1983 and attorney fees under 42 U.S.C. § 1988. Although the district court based its final judgment only on Elliott's federal-law theory and not his state-law theories, Elliott received the full relief that his state-law theories could have provided, so nothing more needed to be decided. The State and the Board appealed the final judgment.

II. *Analysis*

The issue is whether the district court correctly decided that the layoff provisions of Senate Bill 1 violate the Contract Clause when applied retroactively to a teacher who earned tenure before the new statute took effect. We review the district court's decision *de novo. Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445, 458 (7th Cir. 2002) (reviewing *de novo* a summary judgment order that declared a state law unconstitutional).

At the outset, we note but bypass a potentially difficult issue. Elliott sought, and the district court awarded, damages under 42 U.S.C. § 1983. In *Carter v. Greenhow*, 114 U.S. 317 (1885), the Supreme Court found that there was no federal question jurisdiction over the plaintiff's Contract Clause claim. Using a predecessor of § 1983, the plaintiff challenged a state law that affected his state-issued bonds by prohibiting him from using his coupons to pay his property taxes. *Id.* at 321–23. Some courts have read *Carter* broadly as prohibiting

any Contract Clause claims under § 1983. See *Kaminski v. Coulter*, 865 F.3d 339, 347 (6th Cir. 2017); *Crosby v. City of Gastonia*, 635 F.3d 634, 640 (4th Cir. 2011). But Supreme Court and other opinions reflect another view, reading *Carter* as based more narrowly on the way the particular claim in that case was pled and the failure to satisfy the amount-in-controversy requirement applicable at the time. See *Dennis v. Higgins*, 498 U.S. 439, 451 n.9 (1991), quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 n.29 (1979); *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 886–87 (9th Cir. 2003) (per curiam); see also *White v. Greenhow*, 114 U.S. 307, 307–08 (1885) (allowing claim for damages for violation of Contract Clause in companion case to *Carter*); *Kaminski*, 865 F.3d at 350 (Moore, J., dissenting) (arguing for limited scope of *Carter*). We need not take sides on this question. It does not affect our subject matter jurisdiction, and the defendants have waived this potential defense. They did not raise it in the district court, and the State told us at argument that the defendants do not rely on *Carter*.

Turning to the merits, the Contract Clause prohibits States from passing any "Law impairing the Obligation of Contracts," U.S. Const. art. I, § 10, cl. 1, but not all laws affecting contracts are unconstitutional. The Contract Clause prohibits changes in law only if they operate "as a substantial impairment of a contractual relationship." *General Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992), quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). This standard balances individual rights to organize personal affairs against the States' "necessarily reserved" sovereign power to protect the general welfare. *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977). The Supreme Court has harmonized these interests by applying a two-step analysis, asking

first whether a change in state law has substantially impaired a contractual relationship, *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983), and second whether the impairment is reasonable and necessary for a legitimate public purpose. *United States Trust*, 431 U.S. at 25; *Allied Structural Steel*, 438 U.S. at 247.

A. *Substantial Impairment of Contractual Rights?*

We consider first whether applying Senate Bill 1 to Elliott substantially impaired his tenure contract. This issue itself can be divided into three parts: (1) whether there is a contractual relationship; (2) whether a change in law impairs that contract; and (3) whether the impairment is substantial. *General Motors*, 503 U.S. at 186.

1. *The Contractual Relationship*

Statutes typically create regulatory rights not subject to the Contract Clause. See, e.g., *Phelps v. Board of Education of West New York*, 300 U.S. 319, 323 (1937) (New Jersey tenure law did not create contract rights for teachers protecting them from salary reductions during Great Depression). But when a legislature uses contractual language that induces public reliance, it can create an enforceable contract, as the Supreme Court held Indiana's teacher tenure law did. *Indiana ex rel. Anderson v. Brand*, 303 U.S. 95, 100, 105 (1938). The defendants do not dispute this general point, but they dispute the scope of the contractual relationship and the obligations it imposes on the State and school districts.[3]

---

[3] The State does, however, ask us to treat *Anderson* as an obsolete relic based arbitrarily on the particular language used in the 1927 Act. That is not for us to say. And regardless of any shift in how the Supreme Court

### 2. *Impairment of Contractual Rights*

The scope of the contractual obligations determines whether Senate Bill 1 impairs any contractual right. The State makes two main arguments on this point. First, it argues that the Act's job-security provisions are not part of the tenure contract but are variable terms that annual teaching contracts can change. See Def. Br. at 23–24. Therefore, goes the argument, amendments to the job-security terms cannot violate the Contract Clause. Second, the State argues that even if job security is part of the tenure contract, the Act has protected teachers only against dismissal without cause. Firing teachers based on performance is still firing for cause, the State argues, so that Senate Bill 1 does not impair any existing contractual right. We reject both of those arguments, which essentially try to rewrite Indiana law and history.

The State makes much of the fact that a tenured teacher works under two contracts, in effect: an indefinite statutory one that provides tenure and an annual one that governs variable terms like salary and hours. Just as annual contracts can change salary, the State argues, they can change the degree of job security that tenure provides without violating the Contract Clause. But *Anderson* and the Act itself squarely block this argument. In *Anderson*, a teacher challenged an amendment to the Act that eliminated job security for teachers in township schools. 303 U.S. at 97–98. *Anderson* considered "the existence and nature" of the Indiana teacher tenure law and found that it created a "binding and enforceable contract against school districts." *Id*. at 100, 105. The Supreme Court

---

might interpret the Contract Clause today, generations of Indiana teachers have relied on *Anderson* and the teacher tenure law it interpreted.

ultimately determined that the statutory amendment impaired the tenure contract when it changed the "admissible grounds of cancellation" by revoking the State's statutory promise to tenured township teachers. *Id.* at 105. If the grounds of cancellation were subject to change through annual teaching contracts, the Court in *Anderson* could not have concluded that repealing job-security provisions impaired the tenure contract. The Act—not the annual contracts—granted Elliott his contractual tenure rights. Under *Anderson*, these rights became enforceable the year Elliott earned tenure. A decrease in job security necessarily impairs his rights under that contract.

It is also well established under Indiana law that the Act protects against more than at-will termination. As noted, the Act allows schools to dismiss a tenured teacher during a "justifiable decrease in the number of teaching positions," Ind. Code § 26-6967.2 (1927), without much qualification. But early on, the Indiana courts concluded that reducing teaching staff does not permit schools to lay off whichever teachers they please. In *Watson v. Burnett*, 23 N.E.2d 420, 423 (Ind. 1939), a school district laid off a tenured teacher who was qualified to teach positions that non-tenured teachers continued to teach. When challenged, the school district relied on its authority to fire tenured teachers when reducing teaching staff. The Indiana Supreme Court held that the Act did not permit this result, reasoning that if "a justifiable decrease in the number of teaching positions should be held to give the [district] the power to choose between tenure and non-tenure teachers," then the district would have "the power to nullify the Teachers' Tenure Act." *Id.* This holding answers our question directly: before Senate Bill 1, the Act granted a qualified tenured

teacher an enforceable contractual right to be retained over non-tenured teachers during a reduction in force.

From the enactment of the Act in 1927, Indiana teachers thus benefitted from enforceable contractual rights when they became tenured. These contractual rights included job security rights in a layoff. Senate Bill 1, when applied retroactively to a teacher like Elliott who earned tenure before 2012, impairs those job security rights and the tenure contract. See *United States Trust*, 431 U.S. at 19 n.17 (law adjusting the "express terms of an agreement" is more likely to be an unconstitutional impairment).

### 3. *"Substantial" Impairment*

Laws impairing contracts violate the Contract Clause only if the impairment is substantial, though substantial impairment does not require a complete destruction of the contractual relationship. *Energy Reserves*, 459 U.S. at 411. The issue is whether the impairment disrupts reasonable contractual expectations. *Id*. at 413–16; *Allied Structural Steel*, 438 U.S. at 245. The Supreme Court's decisions under the Contract Clause show that reliance interests are key to this inquiry. The analysis must "reflect the high value the Framers placed on the protection of private contracts." *Allied Structural Steel*, 438 U.S. at 245. Contracts "enable individuals to order their personal and business affairs," and once arranged, "those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id*.

Based on our reading of the Court's cases, we break this inquiry into two questions. First, was the impaired term a "central undertaking" of the bargain such that it "substantially induced" teachers to enter their contracts? See *City of El*

*Paso v. Simmons*, 379 U.S. 497, 514 (1965). Second, was the change in law foreseeable, meaning that the risk of change was reflected in the original contract? *Energy Reserves*, 459 U.S. at 413–16. Put another way, we ask whether this change substantially disrupted teachers' important and reasonable reliance interests. *Id*.

> a. *Central Undertaking*

Legislation causes a substantial impairment if it alters a "central undertaking" of the contract that "substantially induced" a party to enter the bargain. *Simmons*, 379 U.S. at 514 (finding no substantial impairment when it could not "seriously be contended that the buyer was substantially induced to enter into the[] contracts" on the basis of the impaired term). In other words, an impairment is substantial if it disrupts actual and important reliance interests. Here, the term at issue is narrow but important. When Elliott decided to become a tenured teacher, the State and school district promised him a substantial degree of job security: during a downsizing, Elliott's job would be more secure than that of a non-tenured teacher.

The promise of job security, especially during layoffs, lies close to the core of teacher tenure. Having job security, even in tough economic times, was a central term to induce people to become teachers and seek tenure in Indiana. It is a term with significant value to teachers, who as a matter of economics have traded higher salaries for the protections that tenure offers over the course of a career. Teachers earn lower salaries than similarly educated professionals. They receive part of their compensation through other benefits, including better job security, which includes a reduced risk of termination during staff reductions. This lower risk has material value

and was a primary consideration that teachers could rely upon when seeking tenured employment.[4]

An impairment is even more substantial when it disrupts expectations "in an area where the element of reliance was vital." *Allied Structural Steel*, 438 U.S. at 246. In that case, the Court considered how severely a change in pension law disrupted an employer's expectations about pension obligations. *Id*. at 246–47. The Court found this reliance particularly important. Here we consider not an employer's but employees' expectations, yet the same reasoning applies. Just as an employer relies on a stable pension regime to fund its pension program properly, so too teachers rely on a stable job-security scheme to plan their personal and professional lives, their investments of time and money, and their retirements. Senate Bill 1 substantially disrupted tenured teachers' expectations about job security. It is not fair to change the rules so substantially when it is too late for the affected parties to change course. Tenured teachers cannot have do-overs in their careers, either to earn more money to make up for the lost job

---

[4] A recent report by the Economic Policy Institute found that public school teachers in the United States earn 11% less on average than similarly educated professionals. See Sylvia A. Allegretto & Lawrence Mishel, "The Teacher Pay Gap is Wider than Ever," at 17–18 (2016), accessible at http://www.epi.org/publication/the-teacher-pay-gap-is-wider-than-ever-teachers-pay-continues-to-fall-further-behind-pay-of-comparable-workers/. This estimate takes into consideration non-wage benefits such as pension, insurance, and paid leave, but not job security. *Id*. at 14–17. A 2015 report by the Organisation for Economic Cooperation and Development found that in the United States, public school teachers earn 67% to 71% of the salary of the average professional with similar education. Education at a Glance 2015: OECD Indicators at 442, accessible at http://dx.doi.org/10.1787/eag-2015-en.

security or to find better job security in another school district or in another field entirely.

###### b. *Foreseeability*

There is a second requirement for the impairment to be substantial: the parties must not have anticipated the change in law. We have said that the "foreseeability of the [new] law when the original contract was made" is of "great" and even "controlling" importance. *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 894 (7th Cir. 1998). If the parties anticipated a change in the law, then their bargain would reflect the risk of a future impairment. *Id*. at 894–95 ("[W]hat was foreseeable then will have been taken into account in the negotiations over the terms of the contract."). If the new law was foreseeable, then reliance on the impaired terms may have been unreasonable so that a disruption to the relationship would not be deemed substantial.

The Supreme Court has found that a change in law was foreseeable in at least two contexts. In the first, the Court pointed to the history of "extensive and intrusive" regulation in the affected industry. *Energy Reserves*, 459 U.S. at 413–16 (new price controls on natural gas did not disrupt the supplier's reasonable expectations when the industry was heavily regulated and supplier "knew its contractual rights were subject to alteration by state price regulation"). In the second, the Court reasoned that because the original law had only a temporary goal, the parties must have anticipated a future legislative change. *Simmons*, 379 U.S. at 516 (change in land-sale law did not impair contracts when goal of law shifted from settlement of Texas frontier to "efficient utilization of public lands").

These contexts are quite different from teacher tenure. One can anticipate that any state law may change in the future, but retroactive application to impair existing contract rights and reliance interests is another question. Retroactive application of legislation like Senate Bill 1 was unforeseeable when teachers like Elliott became tenured. Indiana has historically regulated teacher compensation, but "a history of regulation is never a sufficient condition" by itself. *Chrysler Corp.*, 148 F.3d at 895. The question is whether the nature of the regulation puts the party "on notice that an entirely different scheme" would likely be imposed. *Id*. Although Indiana has regulated teacher tenure since 1927, the Supreme Court held in 1938 that those regulations were contractual, protected by the Contract Clause. *Anderson*, 303 U.S. at 105. The State did not materially amend those terms for more than eighty years.

Senate Bill 1 was thus not a "small and predictable step" in the evolution of the Act, see *Chrysler Corp.*, 148 F.3d at 895, at least as applied to already-tenured teachers. For teachers who have built their entire careers relying on those contractual rights as protected in *Anderson*, Senate Bill 1 amounts to unforeseeable backtracking by the State. This change in the fundamental trade-off of job security for money is not comparable to shifting pricing arrangements for natural gas markets. Nor are attracting qualified teachers and improving public education merely temporary goals that Indiana no longer pursues. Retroactive application of the layoff provisions of Senate Bill 1 to already-tenured teachers is not a foreseeable change that restricts "a party to those gains reasonably to be expected from the contract." *Simmons*, 379 U.S. at 515.

Indiana itself created the binding obligation on which tenured teachers have relied for decades—and from which the State itself has benefitted. This is not a case where private parties "whose rights . . . are subject to state restriction" attempt to "remove" themselves "from the power of the State by making a contract about them." *Blaisdell*, 290 U.S. at 437–38. Rather, Indiana established the teachers' contractual rights by statute. When a State enters a binding commitment, the other party's reliance on that commitment is even more justified. *Energy Reserves*, 459 U.S. at 412–13, 412 n.14. At any time after *Anderson*, Indiana could have amended its teacher tenure law prospectively, changing it from contractual to regulatory. Indiana declined to do so. This retroactive change to tenure's job protections was not foreseeable. Applying the layoff provisions of Senate Bill 1 substantially impaired Elliott's tenure contract rights by disrupting his reasonable contractual expectations.

B. *Reasonable and Necessary to Serve Important Public Purpose?*

Still, not even all substantial impairments of contracts are unconstitutional. If the impairment is both reasonable and necessary for an important public purpose, then the law does not violate the Contract Clause. *United States Trust*, 431 U.S. at 25. Analyzing Senate Bill 1 within this framework, we agree with the district court that the amendment, though enacted for a legitimate and important public purpose, is unconstitutional as applied to an already-tenured teacher because it was not necessary or reasonable.

As a preliminary matter, the parties disagree about the extent of any deference we might owe the state legislature's policy decision to restrict tenure rights. Courts owe at least some

deference to legislative determinations of reasonableness and necessity. *United States Trust*, 431 U.S. at 22–23; *East New York Savings Bank v. Hahn*, 326 U.S. 230, 234 (1945). The degree of deference differs depending on the severity of the impairment and on the State's self-interest. *Allied Structural Steel*, 438 U.S. at 245 ("The severity of the impairment measures the height of the hurdle the state legislation must clear."); *United States Trust*, 431 U.S. at 25–26 ("[C]omplete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.").

The State argues that heightened scrutiny under *United States Trust* applies only when a State itself enters into a financial obligation and not when the State exercises its police power. But that is not the only context in which a State can have a self-interest. "In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial *or other markets*." *Energy Reserves*, 459 U.S. at 412 n.14 (emphasis added). Also, self-interest is not the only justification for a more searching review. When a State makes an express commitment to private businesses or individuals, reliance may be highly justified. *Id.*, citing *Note, A Process-Oriented Approach to the Contract Clause*, 89 Yale L. J. 1623, 1647–48 (1980). The State therefore must have a substantial reason for breaking its own promise. *Id*.

We do not owe complete deference to the state legislature here. The impairment is substantial, the contract is an express commitment between the State and the teachers, and the State's self-interest is at stake. Under the Indiana Constitution, public education is ultimately the State's responsibility, even if it delegates execution to local school districts. See Ind. Const. art. 8, § 1. The State is thus not acting solely as a market

participant here, for teacher tenure involves much more than impairment of "an isolated private contract." See *East New York Savings Bank*, 326 U.S. at 232 (deferring to legislative decision that impaired private financial contract following market collapse). The tenure contract has been a public promise, and the job security provisions are at the core of the economic bargain between the State and the teachers of local school districts. We need not scrutinize the legislature's decision in great detail to find it lacking, nor should we make the kind of "utilitarian comparison between public benefit and private loss" the Supreme Court has warned against. *United States Trust*, 431 U.S. at 29. Complete deference is unwarranted, and review of the impairment is appropriate.

The Supreme Court refined modern Contract Clause jurisprudence in a series of challenges to state laws during the "unprecedented emergencies" of the Great Depression. *Allied Structural Steel*, 438 U.S. at 242. Thus in *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934), the Court upheld a Minnesota law that temporarily suspended mortgage foreclosures. The Court explained that an "emergency existed" that "furnished a proper occasion for the exercise of the reserved power of the State to protect the vital interests of the community." *Id.* at 444. It compared the economic crisis to a "fire, flood, or earthquake." *Id*. at 439. An emergency is not a requirement for a State to impair contracts but remains relevant to whether an impairment is appropriate. *United States Trust*, 431 U.S. at 22 n.19. With this context in mind, we assess whether the State's decision to impair contracts of already-tenured teachers was reasonable and necessary.

Improving teacher quality and public-education outcomes are both important public interests of the highest order. But

even important goals and good intentions do not justify this substantial impairment of the tenure contract for already-tenured teachers. See *United States Trust*, 431 U.S. at 21 ("the existence of an important public interest is not always sufficient to overcome [the Contract Clause's] limitation"). When a State impairs its own contracts, the impairment must be "clearly necessary" or "essential," not merely convenient or expedient. *Simmons*, 379 U.S. at 516 (upholding law that impaired a contract between Texas and purchasers of land when "clearly necessary" to achieve an important public goal); *United States Trust*, 431 U.S. at 29–30 (invalidating law that impaired contract between States and bondholders when the impairment was not "essential"). A substantial impairment is not necessary if the State could achieve the goal through "a less drastic modification" or "without modifying" the contract "at all." *Id.*

Indiana has not shown it needs to impose this retroactive impairment of its earlier promises of job security to improve teacher quality. Senate Bill 1 does not change the State's power to fire ineffective teachers. School districts have had that power before and after 1927 to the present day. See Ind. Code § 26-6967.2 (1927); *Anderson*, 303 U.S. at 108. Instead, the impairing legislation requires schools to consider small differences in performance among teachers who are *not* ineffective. Here, the Madison school district needed to lay off a handful of teachers to save money. Shortly after deciding to renew Elliott's contract (and shortly after he was elected president of the local teachers union), the school district chose him for layoff. He had never been found ineffective. If he had been, the school district could have fired him without relying on Senate Bill 1. Ten years ago, Elliott was found to need im-

provement in one skill-set, and he apparently made that improvement. That stale problem is the proffered rationale for laying off him instead of a non-tenured teacher. Distinguishing between qualified and effective teachers on such a meager basis is not necessary to achieve Indiana's goals, at least as applied to teachers who earned tenure before Senate Bill 1 took effect.

The Contract Clause does not saddle the State forever with a teacher-tenure system that its policymakers have come to think is bad for public education. The Constitution does not prevent the State from changing the promises it makes on a prospective basis to new teachers. Also, if the State were to conclude that retroactive changes to tenure are necessary, the Contract Clause would give the State the option (much like the Takings Clause) of paying the individuals who would otherwise lose out from the change. (After all, a party to a contract is ordinarily free to breach the contract as long as it is willing to pay damages to the other party.) The State can make the changes it wants, but it cannot foist the costs onto private parties, other than through general taxes. Having restricted tenure for new teachers, the State and its school districts were and are free to buy out the tenure rights of more senior ones.

Finally, the retroactive impairment is not reasonable. Contractual impairments can be reasonable if either (1) the statute "had effects that were unforeseen and unintended" when originally adopted, or (2) "subsequent changes" in circumstances "caused the covenant to have a substantially different impact" than anticipated. *United States Trust*, 431 U.S. at 31–32. In trying to meet this standard, the State emphasizes that

public education is important and that teacher quality improves student achievement. We agree on the first point and have no reason to disagree on the second, but these points were surely as true in 1927, 1957, and 1987 as they are now. In fact, creating "a competent cadre of teachers" was the precise goal when Indiana established teacher tenure. *Stewart v. Fort Wayne Community Schools*, 564 N.E.2d 274, 278 (Ind. 1990). We see no changed circumstances that impose "unforeseen advantages or burdens" on the parties. *Simmons*, 379 U.S. at 515.

The judgment of the district court is AFFIRMED.