SYKES, Circuit Judge.
This case challenges Chicago’s “puppy mill” ordinance, which limits the sources from which pet stores may obtain dogs, cats, and rabbits for resale. The ordinance provides that pet retailers in the city “may offer for sale only those dogs, cats, or rabbits” obtained from an animal control or care center, pound, or kennel operated by local, state, or federal government or “a humane society or rescue organization.” Chicago, III, Code § 4-384-015(b) (2016).
Two Chicago pet stores and a Missouri dog breeder sued to invalidate the ordinance. They allege that it exceeds Chicago’s home-rule powers under the Illinois Constitution and violates the implied limits on state power imposed by the Commerce Clause of the United States Constitution. The district court dismissed the suit for failure to state a claim.
We affirm. The Illinois Constitution permits home-rule units like Chicago to regulate animal control and welfare concurrently with the state. And the puppy-mill *498 ordinance doesn’t discriminate against interstate commerce, even in mild practical effect, so it requires no special cost-benefit justification under the Commerce Clause. Rational-basis review is the default standard, and the ordinance easily passes that test.
I. Background
In 2014 the Chicago City Council acted to address concerns that pet stores in the city sourced their animals from large mill-style breeders, which are notorious for deplorable conditions and abusive breeding practices, including over-breeding, inbreeding, crowded and filthy living conditions, lack of appropriate socialization, and inadequate food, water, and veterinary care. The Council determined that mill-bred pets develop health and behavioral problems, creating economic and emotional burdens for pet owners and imposing financial costs on the City as owners abandon their physically or emotionally challenged pets or surrender them to the shelter operated by the City’s Commission on Animal Care and Control. Nearly a third of all animals that come into the City’s care are owner surrenders—the second largest source of dogs and cats taken in by the Commission (strays are the largest). Chicago budgets about $300,000 each year for its shelter service and spends more than $500,000 every year to euthanize animals.
The Council determined that extinguishing the supply of puppy-mill pets to local pet stores would serve several important policy goals. Among other things, it would (1) limit financial support to mill operators; (2) reduce the financial and emotional toll on Chicago consumers who purchase mill-bred pets with latent physical and behavioral problems; (3) boost placement of shelter pets; and (4) reduce the City’s animal-care and euthanization costs. The Council also determined that banning the retail sale of mill-bred pets may also promote pet adoption from the City’s shelter, which would benefit Chicago residents because the $65 pet adoption fee both offsets the cost to taxpayers of operating the shelter and gives Chicagoans ready access to cheaper pets.
The Council accordingly adopted the following ordinance restricting the sources from which pet stores in the city may obtain dogs, cats, or rabbits for resale:
(b) Restrictions on the retail sale of animals. A retailer may offer for sale only those dogs, cats, or rabbits that the retailer has obtained from:
(1) an animal control center, animal care facility, kennel, pound or training facility operated by any subdivision of local, state or federal government; or
(2) a humane society or rescue organization.
Chicago, III., Code § 4-384-015(b) (2016).
Two Chicago pet stores—Park Pet Shop and Pocket Pets—joined forces with Cedar Woods Farm, a Missouri dog breeder, seeking to invalidate the ordinance. They allege that it exceeds Chicago’s home-rule powers under the Illinois Constitution and amounts to an unconstitutional regulation of interstate commerce in violation of the dormant aspect -of the Commerce Clause. Amended complaints followed—the operative version is the second amended complaint—and the City moved to dismiss for failure to state a claim. See Fed. R. Crv. P. 12(b)(6). The district judge granted the motion, holding that the ordinance is a valid exercise of the City’s home-rule authority under the Illinois Constitution and is not an unconstitutional regulation of interstate commerce under the Commerce Clause. The judge entered final judgment for the City, ahd the plaintiffs appealed.
*499 II. Discussion
We review a dismissal order without deference to the district court’s decision, accepting as true the well-pleaded facts in the complaint and drawing reasonable inferences in the plaintiffs’ favor. Roberts v. City of Chicago, 817 F.3d 561, 564 (7th Cir. 2016). To survive a motion to dismiss under Rule 12(b)(6), the complaint must allege “enough facts to state a claim to relief that is plausible on its face.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). “A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable” as alleged in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).
A bit of background about Chicago’s regulatory scheme helps to place the state and federal constitutional claims in proper context. To operate a pet shop in Chicago requires a license from the City. Chicago, III., Code § 4-384-020(a) (2016). The City’s animal-care ordinance defines “pet shop” broadly as “any person primarily engaged in the business of selling or offering to sell animals suitable for use as pets,” but excludes “the isolated or occasional sale of animals by a person who sells only such animals that he has produced and raised” and “any person engaged in the business of breeding who owns, has possession of, or harbors 5 or fewer female dogs or cats capable of reproductions and sells only those breeding dogs or cats or their offspring.” Id. § 4-384-010. Also excluded are “any animal control center, animal care facility, kennel or pound or training facility” operated by a local, state, or federal government. Id.
Licensees must comply with a host of regulations governing the housing and care of animals offered for sale. For example, the ordinance imposes requirements designed to ensure a sanitary environment for the animals. Id. § 4-384-050. It sets basic standards of animal care. Id. § 4-384-055. It regulates cage size and quality. Id. § 4-384-100. And it requires licensees to submit to regular inspections by city inspectors. Id. § 4-384-130.
Though Chicago’s existing regulatory scheme was already extensive, the puppy-mill ordinance is a far more significant restriction. It narrowly limits the sources from which pet retailers may obtaiii animals for resale: “A retailer may offer for sale only those dogs, cats or rabbits” obtained from an animal care or control facility operated by a unit of local, state, or federal government or from “a humane society or rescue organization.” Id. § 4-384-015(b). A “retailer” is “any person licensed or required to be licensed under this chapter who offers for sale any dog, cat or rabbit in the City.” Id. § 4-384-015(a).
The ordinance thus effectively prohibits large commercial breeders from supplying dogs, cats, and rabbits to pet retailers in the city. This dramatically changes the business model of Chicago’s pet retailers, so it’s no surprise thatUitigation commenced soon after the City adopted the ordinance. This suit alleges that the ordinance is constitutionally infirm in two respects—one state, one federal. We’ll begin with the state constitutional claim.
A. Home-Rule Authority Under the Illinois Constitution
As a home-rule municipality under the Illinois Constitution, Chicago “may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt.” III. *500 Const art. VII, § 6(a). This constitutional provision “was written with the intention that home rule units be given the broadest powers possible.” Scadron v. City of Des Plaines, 153 Ill.2d 164, 180 Ill.Dec. 77, 606 N.E.2d 1154, 1158 (1992). The state constitution further provides that a municipality with home-rule status may “exercise and perform concurrently with the State any power or function of a home rule unit to the extent that the General Assembly by law does not specifically limit the concurrent exercise or specifically declare the State’s exercise to be exclusive.” III. Const, art. VII, § 6(i).
To determine whether the puppy-mill ordinance is a permissible exercise of Chicago’s home-rule powers, we follow the Illinois Supreme Court’s instructions and evaluate the “nature and extent of the problem” at hand and whether the state has a “vital interest and a traditionally exclusive role” in regulating it. City of Chicago v. StubHub, Inc., 366 Ill.Dec. 43, 979 N.E.2d 844, 852-53 (2011). These are commonly referred to as the Kalodimos factors. Kalodimos v. Village of Morton Grove, 103 Ill.2d 483, 83 Ill.Dec. 308, 470 N.E.2d 266 (1984) (developing the doctrine).
The puppy-mill ordinance is aimed at reducing the social problems and economic costs associated with mill-bred pets: the emotional and financial costs incurred by individual Chicagoans who find themselves with sick or troubled pets and the financial strain on the public fisc caused by mill-bred animals. State and local governments alike are vitally concerned with issues of animal control and welfare, and both governments have long regulated animal welfare concurrently. See, e.g., County of Cook v. Village of Bridgeview, 380 Ill.Dec. 733, 8 N.E.3d 1275, 1279 (2014), appeal denied, 388 Ill.Dec. 2, 23 N.E.3d 1200 (2015) (“In Illinois, the problem of animal control, over-population, and the spread of rabies is both a local and statewide concern.”). State government has never had an exclusive role in addressing animal-control issues; concurrent regulation is the norm.
In areas of concurrent authority, the Illinois Constitution expressly requires a clear statement from the state legislature to oust a municipality’s home-rule power. See 5 III. Comp. Stat. 70/7 (2015) (“No law enacted after January 12, 1977, denies or limits any power or function of a home rule unit, pursuant to paragraphs (g), (h), (i), (j), or (k) of Section 6 of Article VII of the Illinois Constitution, unless there is specific language limiting or denying the power or function and the language specifically sets forth in what manner and to what extent it is a limitation on or denial of the power or function of a home rule unit.”). No state animal-control statute explicitly ousts or limits Chicago’s power to regulate in this area.
To the contrary, state law preserves municipal power to regulate animal care and welfare:
Nothing in this Act shall be held to limit in any manner the power of any municipality or other political subdivision to prohibit animals from running at large, nor shall anything in this Act be construed to, in any manner, limit the power of any municipality or other political subdivision to further control and regulate dogs, cats or other animals in such municipality or other political subdivision provided that no regulation or ordinance is specific to breed.
510 III. Comp. Stat. 5/24 (2015).
The plaintiffs point to Village of Bridge-view as support for their home-rule challenge, but that case is inapposite. At issue there was a dispute between Cook County and the Village of Bridgeview, a municipal *501 ity within the county’s borders. 380 Ill.Dec. 733, 8 N.E.3d at 1277-78. The two governmental units had promulgated conflicting regulations aimed at eradicating the problem of rabid feral cats. Id. To resolve the regulatory conflict, the state appellate court had to decide which governmental unit had a more traditional role and vital interest in controlling and preventing the spread of rabies.
The court held that rabies control is a matter of statewide concern and “do[es] not strictly pertain to the government and affairs of Bridgeview as a home rule unit.” Id., 380 Ill.Dec. 733, 8 N.E.3d at 1280. The court noted as well that the state and county governments had a “more traditional role” in addressing problems of rabies control. Id. Moreover, county government has a “greater geographical reach” and “can more comprehensively and effectively address feral cat control than local municipalities.” Id., 380 Ill.Dec. 733, 8 N.E.3d at 1279. In short, the Kalodimos factors all pointed in the same direction: the county ordinance prevailed over the village ordinance. Id., 380 Ill.Dec. 733, 8 N.E.3d at 1280.
No similar regulatory conflict exists here. Illinois is not trying to regulate in this space, much less regulate exclusively. The puppy-mill ordinance does not exceed the City’s home-rule authority under the Illinois Constitution.
B. Dormant Commerce Clause
The Commerce Clause grants Congress the power to “regulate Commerce ... among the several States,” U.S. Const. art. I, § 8, cl. 3, but the Supreme Court has long held that a “dormant” or “negative” component of the Clause implicitly limits the states from “erecting barriers to the free flow of interstate commerce” even where Congress hasn’t acted, see, e.g., Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 440, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978). The doctrine is not generally applicable. It does not apply to every state and local law that affects interstate commerce. “Because even ‘local’ activities displace the movement of goods, services, funds, and people, almost every state and local law— indeed almost every private transaction— affects interstate commerce.” Nat’l Paint & Coatings Ass’n v. City of Chicago, 45 F.3d 1124, 1130 (7th Cir. 1995). Dormant Commerce Clause doctrine applies only to laws that discriminate against interstate commerce, either expressly or in practical effect. Id. at 1130-31.
We have explained that state and local laws fall into one of three categories for purposes of dormant Commerce Clause analysis. “The first category comprises laws that explicitly discriminate against interstate commerce”; laws of this type are treated as presumptively unconstitutional. Id. at 1131. “The second category comprises laws that appear to be neutral among states but that bear more heavily on interstate commerce than on local commerce.” Id. Facially nondiscriminatory laws sometimes have a discriminatory effect on interstate commerce, and “[w]hen the effect is powerful, acting as an embargo on interstate commerce without hindering intrastate sales,” the law is treated as the equivalent of a facially discriminatory statute. Id.
On the other hand, laws that are facially nondiscriminatory but have “mild disparate effects and potential neutral justifications” are analyzed under Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), which established a balancing test that requires the reviewing court to weigh the burden on interstate commerce against the nature and strength of the state or local interest at stake. Nat’l Paint, 45 F.3d at 1131. *502 More specifically, Pike holds that when a state or local statute
regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will df course depend on the nature of the local interest involved, and on whether it' could be promoted as well with a lesser impact on interstate activities.
397 U.S. at 142, 90 S.Ct. 844 (citation omitted). Importantly for our purposes, however, Pike balancing is triggered only when the challenged law discriminates against interstate commerce in practical application. Pike is not the default standard of review for any state or local law that affects interstate commerce. Nat’l Paint, 45 F.3d at 1131.
“If the first category may be called disparate treatment, and the second disparate impact, the third category comprises laws that affect commerce without any reallocation among jurisdictions”—in other words, laws “that do not give local firms any competitive advantage over those located elsewhere.” Id. In this third category, “the normal rational-basis standard is the governing rule.” Id. “Unless the law discriminates against interstate commerce expressly or in practical effect, there is no reason to require special justification.” Id. at 1132. To put the point in plainer terms: “No disparate treatment, no disparate impact, no problem under the dormant commerce clause.”[1] Id.
The puppy-mill ordinance does not expressly discriminate against interstate commerce. By limiting Chicago pet stores to dogs, cats, and rabbits sourced from public or private nonprofit shelters, the ordinance evenhandedly prohibits all large commercial breeders—whether located in Illinois or out of state—from selling dogs, cats, and rabbits to Chicago pet stores. Because there is no disparate treatment, the ordinance does not fall within the first category.
It does not fall within the second category either. The puppy-mill ordinance does not have a disparate impact on out-of-state breeders; breeders in Illinois enjoy no competitive advantage over their counterparts outside the state. All breeders are similarly disadvantaged. And unless the challenged law discriminates against interstate commerce in practical effect, the dormant Commerce Clause does not come into play and Pike balancing does not apply.
The plaintiffs ask us to infer that Chica-goans will respond to the puppy-mill ordinance in part by turning directly to breeders for their purebred pets. Indulging that inference doesn’t support a conclusion that the ordinance has a discriminatory effect on interstate commerce. While it’s plausi *503 ble to infer that Chicago consumers may prefer to patronize breeders located closer to the city over those that are farther away, that inference would show only that the ordinance may confer a competitive advantage on breeders that are not too distant from Chicago. But those breeders are as likely to be located in nearby Wisconsin or Indiana as they are in suburban Chicago or downstate Illinois. So the supposition that Chicagoans will turn directly to breeders for their pure-bred pets does not establish that the ordinance has a discriminatory effect on breeders located out of state.
Perhaps Chicago consumers might respond to the ordinance by turning to small breeders rather than traveling to a large breeder outside Chicago (whether in state or out of state). But that would have the effect of simply shifting sales among different sources of pets without regard to location. “Favoritism for [small breeders over pet stores and large breeders] does not pose a constitutional problem.... ” Baude v. Heath, 538 F.3d 608, 615 (7th Cir. 2008). Again, dormant Commerce Clause doctrine is concerned only with regulation that discriminates against out-of-state firms. Nat’l Paint, 45 F.3d at 1131-32; Amanda Acquisition Corp. v. Universal Foods Corp., 877 F.2d 496, 505 (7th Cir. 1989).
Perhaps Chicagoans might turn not to breeders (whether large or small, in state or out of state) but to pet stores in the surrounding suburbs or directly to the City’s shelter or a shelter operated by a local private nonprofit. This just shifts business within the state; it has no effect on interstate commerce. See Missouri Pet Breeders Ass’n v. County of Cook, 106 F.Supp.3d 908, 923 (N.D. Ill. 2015) (“[N]either of these outcomes imposes a burden on interstate commerce [because] business would simply shift between entities within Illinois.” (citing Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 126 n.16, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978))).
The plaintiffs argue that the puppy-mill ordinance is a de facto ban on pets bred out of state. It is not. Chicago has not attempted to regulate beyond its borders. The ordinance doesn’t ban animals from out-of-state breeders, either expressly or in practical effect. It affects large breeders—wherever they’re located—in exactly the same way. Both can sell directly to Chicago consumers, but they may not sell to city-licensed pet retailers.
Finally, the plaintiffs maintain that dismissal on the pleadings is improper because Pike balancing requires a factual record. It’s true as a general matter that “[a]ny balancing approach, of which Pike is an example, requires evidence.” Baude, 538 F.3d at 612. As we’ve explained, however, Pike balancing is required only if the challenged law has a discriminatory effect on interstate commerce. And eonclusory allegations of disparate impact are not sufficient; to survive the City’s motion to dismiss, the plaintiffs needed to plead specific facts to support a plausible claim that the ordinance has a discriminatory effect on interstate commerce. Adams v. City of Indianapolis, 742 F.3d 720, 733 (7th Cir. 2014). Because they haven’t done so, Pike balancing is not required. See New York Pet Welfare Ass’n v. City of New York, 850 F.3d 79, 90-91 (2d Cir. 2017) (affirming a Rule 12(b)(6) dismissal of an analogous challenge to a puppy-mill ordinance).
Accordingly, the ordinance falls into the third category, which comprises state and local laws that “affect commerce without any reallocation among jurisdictions”; that is, laws that “do not give local firms any competitive advantage over those located elsewhere.” Nat’l Paint, 45 F.3d at 1131. For laws in this category, the default rational-basis standard of review *504 applies. Id. No surprise, the ordinance easily survives review for rationality. Chicago’s justifications for the ordinance are plentiful and plausible. The City’s policy goals are to reduce financial support for mill breeders, curb the emotional and financial burdens on consumers who unwittingly buy mill-bred pets, and reduce the cost of sheltering and euthanizing unwanted problem pets. These are unquestionably legitimate governmental interests, and it’s rational to think that the puppy-mill ordinance will serve them.
Because the plaintiffs did not plead a plausible claim that the puppy-mill ordinance violates either the Illinois Constitution or the dormant Commerce Clause, the case was properly dismissed for failure to state a claim.
Affirmed.

. As Judge Hamilton reads the legal terrain, National Paint is no longer valid in light of intervening developments in dormant Commerce Clause doctrine—specifically, the Supreme Court’s decisions in Department of Revenue of Kentucky v. Davis, 553 U.S. 328, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008), and United Haulers Association v. Oneida-Herkimer Solid Waste Management Authority, 550 U.S. 330, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007). Dissent at p. 504-05. We disagree. We do not read the quoted passages of Davis and United Haulers as extending Pike balancing to all state laws—even those that have no discriminatory effect on interstate commerce. Read in context, the Court’s references to “nondis-criminatoiy” laws in these passages must be understood to mean facially nondiscriminatory laws that have discriminatory practical effects on interstate commerce—or in the National Paint taxonomy, state laws that have a disparate impact on interstate commerce.