In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-1520

MINERVA DAIRY, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

SHEILA HARSDORF, In her official capacity as the Secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 17-cv-00299 — **James D. Peterson**, *Chief Judge*.

ARGUED SEPTEMBER 13, 2018 — DECIDED OCTOBER 3, 2018

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

FLAUM, *Circuit Judge*. Minerva Dairy is an Ohio-based, family-owned dairy company that produces, among other products, Amish-style butters in small, slow-churned batches using fresh milk supplied by pasture-raised cows. Minerva challenges Wisconsin's butter-grading requirement as a violation of the Due Process Clause, the Equal Protection Clause,

and the dormant Commerce Clause. The district court granted summary judgment to the state defendants, holding that the Wisconsin statute is rationally related to the state's legitimate interest in consumer protection and does not discriminate against out-of-state businesses. We agree with the district court's analysis and, therefore, we affirm the judgment.

## I. Background[1]

### A. Wisconsin's Butter Grading Law

Under Wisconsin law, "[i]t is unlawful to sell … any butter at retail unless it has been graded." Wis. Stat. § 97.176(1). In addition, "[n]o person shall sell … any butter at retail unless its label bears a statement of the grade." Wis. Admin. Code ATCP § 85.06(2). To satisfy this requirement, the butter may be graded by either a Wisconsin-licensed butter grader or, alternatively, by the United States Department of Agriculture ("USDA").[2] Wis. Stat. § 97.176(2); Wis. Admin. Code ATCP § 85.06(5). This grading requirement applies to butter manufactured both in-state and out-of-state. Wis. Stat. § 97.176(5).

Wisconsin recognizes four grades of butter: Grade AA ("fine and highly pleasing butter flavor"); Grade A ("pleasing and desirable butter flavor"); Grade B ("fairly pleasing butter flavor"); and "Wisconsin Undergrade Butter" (any butter that "fails to meet the requirements for Wisconsin Grade B"). Wis.

---

[1] The following facts are undisputed except where otherwise noted.

[2] The USDA offers a butter-grading service to dairy product manufacturing plants for a price. 7 C.F.R. § 58.122(b). However, this grading service is voluntary and is not required to sell butter interstate. *Id.*

Admin. Code ATCP § 85.03.[3] The butter grade is based on an "examination for flavor and aroma, body and texture, color, salt, [and] package" according to "tests or procedures approved by" the Department of Agriculture, Trade, and Consumer Protection ("the Department"). Wis. Stat. § 97.176(3). Specifically, butter is graded on eighteen "[f]lavor characteristics," eight "[b]ody characteristics," four "[c]olor characteristics," and two "salt characteristics." Wis. Admin. Code ATCP § 85.04(1). The Department further qualifies all of these characteristics by "intensity"—"[s]light," "[d]efinite," or "[p]ronounced." *Id.* § 85.04(2). To grade a batch of butter, a tester tastes a "representative butter sample" and identifies "[e]ach applicable flavor characteristic" and its "relative intensity." *Id.* § 85.02(1). This results in a "preliminary letter grade," which can be reduced if there are defects in the "body, color and salt characteristics." *Id.* § 85.02(1)–(3); *see also id.* § 85.05. There is an appeal process for producers who dispute the grade a batch of butter receives. *See id.* § 85.08.

To become a licensed butter-grader in Wisconsin, one must apply to the Department and pay a $75 fee. Wis. Admin. Code ATCP § 85.07. On the application form, the applicant must "nam[e] the location where the grading is to be done." *Id.* § 85.07(1). The applicant must then take the butter-grading exam at either the Department, the University of Wisconsin, or a prearranged butter-making facility in Wisconsin. The exam includes a written test covering applicable Wisconsin

---

[3] Wisconsin's butter-grading standards are materially identical to the USDA's butter-grading standards. *See* Agricultural Marketing Service, USDA, *United States Standards for Grades of Butter* (1989), https://www.ams.usda.gov/sites/default/files/media/Butter_Standard%5B1%5D.pdf.

law and the butter-making process. In addition, the applicant must grade butter in front of the Department's licensed grader. Although formal education or experience is not required to take the exam, most applicants have some previous experience at a butter plant or facility. Some applicants prepare for the exam by taking a short course offered by the Center for Dairy Research at the University of Wisconsin. Approximately ninety percent of applicants pass the butter-grading exam. The license is renewable every two years upon payment of the $75 fee. *Id.* § 85.07(2).

On its face, the statute does not prohibit out-of-state individuals from applying to become Wisconsin-licensed butter-graders. *See* Wis. Stat. § 97.175(2) ("A person desiring a license shall apply …"). In fact, there are currently twelve Wisconsin-licensed butter graders who work either in Wisconsin, at an out-of-state facility, or both.[4] However, plaintiffs allege that, prior to the filing of this lawsuit in April 2017, the Department did not allow Wisconsin-licensed graders to grade butter at out-of-state facilities. To support this assertion, plaintiffs' counsel submitted two declarations in which counsel states that she called the Department in March 2017 to inquire whether Wisconsin-licensed graders could grade butter at out-of-state facilities. Plaintiffs' counsel says she was directed to a Department official named Mike Pederson who advised her that the Department does not allow Wisconsin-licensed graders to grade butter at out-of-state facilities. Pederson responded in a declaration of his own that he misunderstood

---

[4] *See* Wisconsin Department of Agriculture, Trade and Consumer Protection, Buttermaker License Holders, available at https://myda-tcp.wi.gov/Home/ServiceDetails/8474e17b-fba1-e711-8100-0050568c4f26?Key=Services_Group (last visited Oct. 2, 2018).

plaintiffs' counsel's question to be whether the Department had butter graders who could travel out-of-state to grade butter at out-of-state facilities. He clarified that while the Department does not send the graders it employs out of state, it does allow Wisconsin-licensed butter graders to be employed and reside out of state.

In this litigation, Peter Haase, director of the Department's Bureau of Food and Recreational Businesses, testified that to his knowledge there had been no out-of-state butter graders prior to 2017. When asked whether there was a Department policy that prohibited out-of-state butter graders from being licensed in Wisconsin, Haase testified that there was not a "written policy" to that effect. When asked whether there was an "unwritten policy," Haase answered: "I can't speak definitively to what may or may not have been allowed prior to my tenure as bureau director, but I would have to agree that prior to 2017 there may have been a nonwritten understanding that individuals outside of Wisconsin could not hold a Wisconsin butter-graders license." When asked why the Department had that understanding, Haase said, "It's my understanding that clear interpretation of statute or administrative rule didn't prohibit it nor allow it." Haase later filed a declaration in which he explained that, after the filing of this lawsuit, Department officials "confirmed the butter grading law allowed both in-state and out-of-state butter makers to become licensed Wisconsin butter graders and could grade butter in any location, so long as that location was identified on the application and license."

## B. Factual and Procedural Background

Adam Mueller is the president of Minerva Dairy, a family-owned dairy company located in Minerva, Ohio. Among

other products, Minerva Dairy produces Amish-style butters in small, slow-churned batches using fresh milk supplied by pasture-raised cows. Minerva Dairy does not pay to have its butter graded under the voluntary USDA grading system and has never had its butter graded by a Wisconsin-licensed butter grader. Minerva Dairy has sold its artisanal butter to consumers in every state, including Wisconsin. However, in early 2017 the Department received an anonymous complaint about ungraded Minerva Dairy butter being sold at a retail store called Stinebrink's Lake Geneva Foods. After verifying the complaint, the Department sent Minerva Dairy a warning letter on February 28, 2017. As a result, the company stopped selling its butter at retail stores in Wisconsin.

Mueller and Minerva (collectively, "Minerva" or "plaintiffs") sued several Department officials under 42 U.S.C. § 1983, alleging that Wisconsin's butter-grading statute violates the Due Process Clause, the Equal Protection Clause, and the dormant Commerce Clause. Minerva requested an injunction preventing the Department from enforcing the butter-grading requirement and a declaration that the butter-grading law is unconstitutional.

The parties filed cross-motions for summary judgment on Minerva's three claims. The district court denied Minerva's motion and granted summary judgment in favor of the Department. In doing so, the court ruled that Wisconsin's butter-grading law did not violate the Due Process Clause or the Equal Protection Clause because it is rationally related to the state's legitimate interest in consumer protection. The court further held that the statute did not violate the dormant Commerce Clause because it did not discriminate against out-of-state businesses.

## II. Discussion

"We review a grant of summary judgment *de novo*, and examine the record and all reasonable inferences in the light most favorable to the non-moving party." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). "Summary judgment is proper if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "We will reverse a grant of summary judgment if a material issue of fact exists that would allow a reasonable jury to find in favor of the non-moving party." *Id.*

### A. Wisconsin's Butter-Grading Law Does Not Violate the Due Process Clause

The Fourteenth Amendment prohibits the state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. One component of substantive due process is the right to earn a living free from "unreasonable governmental interference." *Greene v. McElroy*, 360 U.S. 474, 492 (1959). Where, as here, plaintiffs challenge an economic regulation, we apply the rational basis test. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1130 (7th Cir. 1995). "Under rational-basis review, a statutory classification comes to court bearing 'a strong presumption of validity,' and the challenger must 'negative every conceivable basis which might support it.'" *Ind. Petroleum Marketers & Convenience Store Ass'n v. Cook*, 808 F.3d 318, 322 (7th Cir. 2015) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993)). In other words, to uphold the statute, "we need only find a 'reasonably conceivable state of facts that could provide a rational basis' for the classification." *Id.* (quoting *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1072 (7th Cir. 2013)). "This

deferential standard of review is a notoriously 'heavy legal lift for the challenger[].'" *Monarch Beverage Co. v. Cook*, 861 F.3d 678, 681 (7th Cir. 2017) (alteration in original) (quoting *Ind. Petroleum Marketers*, 808 F.3d at 322).

Here, Wisconsin's butter-grading statute is rationally related to at least two conceivable state interests. First, as the district court explained, "[t]he state could believe that required butter grading would result in better informed butter consumers" and allow consumers to "purchase butter with confidence in its quality." Courts have routinely held that consumer protection is a legitimate state interest. *See, e.g.*, *SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 194 (2d Cir. 2007) (upholding constitutional challenge to state law that regulated terms and conditions of prepaid gift cards in part because "consumer protection is a field traditionally subject to state regulation"). And labeling laws like the one at issue here advance that interest by giving consumers relevant product information that may influence their purchasing decisions. *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 23–26 (D.C. Cir. 2014) (holding that the government had a "substantial" interest in requiring country-of-origin labeling on food in part because it "enable[d] consumers to choose American-made products"). Of course, not all consumers will care about a butter's grade, just as not all consumers will care about whether a food item is genetically modified or organic. *See* National Bioengineered Food Disclosure Standard, Pub. L. No. 114-216, 130 Stat. 834 (2016) (directing USDA to develop GMO-disclosure standards); Food, Agriculture, Conservation, & Trade Act of 1990, Pub. L. No. 101-624, 104 Stat. 3359 (establishing national standards governing the marketing of certain agricultural products as organic). But it is reasonable to think that some consumers care about the quality of butter

they purchase—for example, experienced bakers—and the state has a legitimate interest in ensuring that those consumers receive that information. Indeed, "many such [disclosure] mandates have persisted for decades without anyone questioning their constitutionality." *Am. Meat Inst.*, 760 F.3d at 26.

Second, and relatedly, Wisconsin's mandatory butter-grading scheme is rationally related to the state's legitimate interest in promoting commerce. On this point, the "historical pedigree" behind Wisconsin's butter-grading law is "telling." *See id.* at 23–24 (noting that the "historical backdrop" behind country-of-origin labels "has made the value of this particular product information to consumers a matter of common sense"). Butter grades were initially established by individual local exchanges in order to ensure an "accurate basis for trading" and "to establish, for each grade, a market price commensurate with quality." *See* Edward Wiest, *The Butter Industry in the United States: An Economic Study of Butter and Oleomargarine* 119 (1916). However, some local exchanges used different standards, so consumers in distant markets were not always sure what they were getting. *See id.* at 134–35. Thus, in 1919, the USDA established a universal standard to better "facilitate … business with customers in distant places who want to be sure they are getting what they pay for." U.S. Dep't of Agric., *Know Your Butter Grades*, Leaflet No. 264 (1949).

Similarly, Wisconsin also had its own voluntary grading system, but it proved ineffective because many producers of low-quality butter simply skipped grading and went straight to market. *See* Wis. Farm Bureau Fed'n, *A Butter Grading Law:*

*Yes or No* (1953)[5] ("[T]he lackadaisical manner and even negative attitude of the producers of low quality butter prevents a state wide [voluntary] program from effective operation."). For that reason, in 1953, the Wisconsin Farm Bureau published a brochure in support of a proposed butter-grading law in which it explained that wide disparities in butter quality had driven many consumers to abandon butter altogether and turn to butter substitutes instead. *See id.* It determined that mandatory grading according to a universal standard would "stimulat[e] consumer demand for butter of a high uniform quality" and promote Wisconsin's "national reputation" for butter. *Id.*

In this way, the butter-grading requirement is rationally related to the state's legitimate interest in "protect[ing] the integrity of interstate products so as not to depress the demand for goods that must travel across state lines." *United States v. 40 Cases, More or Less of Pinocchio Brand 75% Corn, Peanut Oil & Soya Bean Oil Blended with 25% Pure Olive Oil*, 289 F.2d 343, 345 (2d Cir. 1961); *see also Sligh v. Kirkwood*, 237 U.S. 52, 61 (1915) (upholding Florida law that made it unlawful to sell immature or unfit citrus fruits because it was rationally related to state's legitimate interest in "[t]he protection of the state's reputation in foreign markets, with the consequent beneficial effect upon a great home industry"); *Clark v. Dwyer*, 353 P.2d 941, 946 (Wash. 1960) (en banc) ("[T]he protection of the reputation of Washington apples and the betterment of the industry, and as a result the general welfare, is [a purpose]

---

[5] This brochure can be found at ECF No. 28-1 on the district court's docket.

which could properly be served in the exercise of the police power.").

Minerva counters that, even if these are legitimate state interests, the butter-grading law is not rationally related to these interests because consumers do not understand what the butter grade means. To support this assertion, Minerva points out that state administrative officials who are familiar with the grading system could not even describe some of the butter characteristics used in the grading process during their depositions. Minerva further argues that, even if consumers understand the different butter characteristics, the grade would not convey information about any particular characteristic because it is expressed as a composite score. Finally, Minerva contends that, even if consumers understand the grade, they might disagree with the grader's "subjective" taste preferences. According to Minerva, the district court failed to adequately engage this evidence in the record to determine whether the law actually furthers the government's stated purpose.

These arguments fail for two reasons. First and foremost, on rational-basis review "[the state] does not need to present actual evidence to support its proffered rationale for the law, which can be 'based on rational speculation unsupported by evidence or empirical data.'" *Monarch*, 861 F.3d at 683 (quoting *Beach Commc'ns*, 508 U.S. at 315). Put differently, "a legislative choice is not subject to courtroom fact-finding." *Beach Commc'ns*, 508 U.S. at 315; *see also Nat'l Paint*, 45 F.3d at 1127 ("Outside the realm of 'heightened scrutiny' there is … never a role for evidentiary proceedings."). Because it is reasonable

to conclude that mandatory butter-grading will give consumers relevant product information and promote commerce, the statute survives rational-basis review.

Second, even if the state were required to present actual evidence to support its rationale, Wisconsin's butter-grading statute would still survive rational-basis review. The state has presented some evidence that (1) the industry standards reflect dominant consumer preferences, and (2) the butter-grade statute effectively conveys those preferences. One of the Department's experts, Steve Ingham, testified that, as compared to other products like cheese, "the range of widely accepted characteristics" is "considerably narrower for butter." In particular, he explained that, based on "knowledge or tradition or habit," consumers generally expect "that the word 'butter' means a sweet cream AA grade butter." *See also Know Your Butter Grades*, *supra* ("[T]he grade terms describe certain well-defined characteristics that are important to the consumer in buying butter."). Perhaps for this reason, higher-grade butter has traditionally sold better than lower-grade butter. *See id.* ("[T]op grades frequently command a higher price."). Moreover, although Wisconsin's butter grade is reflected as a composite score, some scholars have concluded that "brief, simple, easy disclosures" that "us[e] symbols instead of sentences" can effectively convey information to consumers. *See* Omri Ben-Shahar & Carl E. Schneider, *The Failure of Mandated Disclosure*, 159 U. Pa. L. Rev. 647, 743 (2011) (citing studies). For example, one study found that Los Angeles County's practice of grading restaurants for cleanliness with an "A," "B", or "C," has influenced consumer behavior. *See id.* at 743 & n.420 (citing Ginger Zhe Jin & Phillip Leslie, *The Effect of Information on Product Quality: Evidence from Restaurant Hy-*

*giene Grade Cards*, 118 Q.J. Econ. 409, 449 (2003)). It is reasonable for the state to believe that the butter-grading system will similarly influence consumer behavior here. Therefore, plaintiffs' substantive due process challenge fails.[6]

### B. Wisconsin's Butter-Grading Law Does Not Violate the Equal Protection Clause

Like the Due Process Clause, the Equal Protection Clause "allows states great latitude in regulating the economy, provided the decision is not wacky." *Saukstelis v. City of Chicago*, 932 F.2d 1171, 1173–74 (7th Cir. 1991) ("Courts bend over backward to explain why even the strangest rules are not *that* far gone."). To carry their burden, plaintiffs must show that Wisconsin's butter-grading law "treats [them] … differently than others similarly situated and the difference in treatment is not rationally related to a legitimate state interest." *See Ind. Petroleum Marketers*, 808 F.3d at 322.

Plaintiffs contend that Wisconsin's butter-grading statute violates the Equal Protection Clause in two ways. First, they claim that there is no rational reason for the state to treat

---

[6] Minerva also contends that, even if the butter-grading law is rational on its face, it is not rational as applied to Minerva. This is so, Minerva argues, because it produces "artisanal butter that is not intended to taste, look, or feel like commodity butter." In other words, Minerva claims that Wisconsin's butter-grading law is irrational because it damages Minerva's brand equity. However, even if legislative classifications "incidentally affect adversely the market value of some of the [product] in question," that does not somehow render the law irrational. *Clark*, 353 P.2d at 947 (holding that change in Washington's apple-grading law survived rational-basis review, even though the change "operate[d] to reduce the market value of" certain red and partial-red variety apples).

graded and ungraded butters differently. On this point, plain-
tiffs raise many of the same arguments they raised with re-
spect to their substantive due process claim. For example,
they argue that there is no consumer-protection rationale for
the disparate treatment because the butter-grading process is
subjective and consumers do not understand what the grades
mean. We have already rejected that argument for the reasons
outlined *supra*. In addition, plaintiffs argue that there is no
market-based reason for the disparate treatment because
"there's no evidence that the butter trade would suffer with-
out grading." As explained *supra*, the state need not present
such evidence under rational-basis review; rather, the burden
is on plaintiffs to present evidence that negates every conceiv-
able basis for the statute. In any event, the historical back-
ground strongly suggests that the statute *is* rationally related
to the state's legitimate interest in stimulating demand and
protecting Wisconsin's national reputation in the butter in-
dustry.

Second, plaintiffs claim that the law irrationally discrimi-
nates between butter and other similarly situated commodi-
ties. Although the Department requires mandatory grading
for butter, it makes grading for several other commodities—
including cheese, honey, and maple syrup—voluntary. *See*
Wis. Admin. Code ATCP § 87.04 (allowing the sale of un-
graded honey); *id.* § 81.22(1)(g) (allowing the sale of ungraded
cheese); *id.* § 87.36(1) (allowing the sale of ungraded maple
syrup). As a result, plaintiffs argue that if Wisconsin's true
goal is to inform consumers and promote commerce, the
state's regulatory scheme is underinclusive. However, the De-
partment presented at least some evidence that butter is ma-
terially different than other commodities, thus warranting dif-
ferent treatment. For example, a Department official testified

that personal butter preferences are less diverse and idiosyncratic than cheese, which suggests that objective grading is possible for butter but not for cheese. In addition, plaintiffs have not presented any evidence that other commodities were historically graded in the same way as butter to promote commerce. Moreover, even if mandatory grading of cheese, honey, and maple syrup would similarly advance consumer protection and promote commerce, "[t]he Equal Protection Clause allows the State to regulate 'one step at a time, addressing itself to the phase of the problem which seems most acute.'" *Clements v. Fashing*, 457 U.S. 957, 969 (1982) (quoting *Williamson v. Lee Optical of Okla. Co.*, 348 U.S. 483, 489 (1955)). In other words, "[t]he State 'need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.'" *Id.* at 969–70 (quoting *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 809 (1969)); *see also Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970) ("[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."). Therefore, the butter-grading statute does not violate the Equal Protection Clause simply because Wisconsin failed to implement mandatory grading schemes for other commodities.

Plaintiffs rely heavily on the Supreme Court's decision in *City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 432 (1985). In that case, the Supreme Court held that a zoning ordinance that required a special-use permit for a group home for the mentally challenged violated the Equal Protection Clause. *Id.* at 450. In so holding, the Court reasoned that the permit requirement was motivated largely by "the negative attitude of the majority of property owners located within 200

feet of the [proposed] facility." *Id.* at 448. The Court explained that "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." *Id.* And the Court reiterated the well-established principle that majority preferences are not a legitimate reason to treat classes of people differently. *See id.* ("[T]he City may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic."). The only other proffered justification for the permit requirement was the "size of the home and the number of people that would occupy it." *Id.* at 449. But in that regard the group home for the mentally challenged was not materially different than a boarding house, nursing home, family dwelling, fraternity house, or dormitory—all of which would have been permitted under the city's zoning ordinance without a special-use permit. *Id.* at 449–50. Because the permit requirement "rest[ed] on an irrational prejudice against the mentally retarded," it did not survive rational-basis review. *Id.* at 450.

*City of Cleburne* is inapplicable here. For starters, we have cautioned against overly-broad readings of that case. *See, e.g., Monarch*, 861 F.3d at 685 ("*City of Cleburne* [is] better understood as [an] extraordinary rather than [an] exemplary rational-basis case[]."). At most, *City of Cleburne* stands for the following uncontroversial proposition:

> If a law is challenged as a denial of equal pro-
> tection, and all that the government can come
> up with in defense of the law is that the people
> who are hurt by it happen to be irrationally
> hated or irrationally feared by a majority of vot-
> ers, it is difficult to argue that the law is rational
> if "rational" in this setting is to mean anything
> more than democratic preference.

*Milner v. Apfel*, 148 F.3d 812, 817 (7th Cir. 1998) (describing
this as "the basis of the *City of Cleburne* … case[]"). By contrast,
as discussed, there are at least two legitimate state interests
underlying the Wisconsin butter-grading statute. In addition,
there is at least some evidence that the state's interests in con-
sumer protection and commerce are more acute with respect
to butter than with respect to other commodities. Therefore,
plaintiffs' reliance on *City of Cleburne* is misplaced.

For all these reasons, plaintiffs' equal protection claim
fails.

**C. Wisconsin's Butter-Grading Law Does Not Violate
the Dormant Commerce Clause**

The Commerce Clause grants Congress the authority "[t]o
regulate Commerce … among the several States." U.S. CONST.
art. I, § 8, cl. 3. Because the framers gave the federal govern-
ment the exclusive power to regulate interstate commerce,
and because federal law preempts state law, the Supreme
Court has inferred the existence of a "dormant" Commerce
Clause that limits states' abilities to restrict interstate com-
merce. *See New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273
(1988) ("[T]he Commerce Clause not only grants Congress the

authority to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce.").

For purposes of dormant Commerce Clause analysis, we consider state laws in three categories. *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 501 (7th Cir. 2017). First, "'laws that explicitly discriminate against interstate commerce'" are "presumptively unconstitutional." *Id.* (quoting *Nat'l Paint*, 45 F.3d at 1131). Second, laws that "'appear to be neutral among states'" on their face may nevertheless have a "discriminatory effect on interstate commerce." *Id.* (quoting *Nat'l Paint*, 45 F.3d at 1131). If "'the effect is powerful, acting as an embargo on interstate commerce without hindering intrastate sales,'" we treat such laws "as the equivalent of a facially discriminatory statute." *Id.* (quoting *Nat'l Paint*, 45 F.3d at 1131). If, on the other hand, the law has "mild disparate effects and potential neutral justifications," we analyze it under the balancing test established by the Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *Id.* (quoting *Nat'l Paint*, 45 F.3d at 1131). Under the *Pike* balancing test, we "weigh the burden on interstate commerce against the nature and strength of the state or local interest at stake." *Id.* If the statute "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Id.* at 502 (quoting *Pike*, 397 U.S. at 142).

Importantly, the dormant Commerce Clause "does not apply to *every* state and local law that affects interstate commerce," but rather "only to laws that *discriminate* against interstate commerce, either expressly or in practical effect." *Id.*

at 501. If the state law "affect[s] commerce without any real-location among jurisdictions" and "do[es] not give local firms any competitive advantage over those located elsewhere," we apply "the normal rational-basis standard." *Id.* at 502 (quoting *Nat'l Paint*, 45 F.3d at 1131). In other words, "[n]o disparate treatment, no disparate impact, no problem under the dormant commerce clause." *Id.* (quoting *Nat'l Paint*, 45 F.3d at 1132).

Wisconsin's butter-grading statute does not expressly discriminate against interstate commerce. The labeling requirement applies to *all* producers, whether they reside in-state or out-of-state. *See* Wis. Admin. Code ATCP § 85.06(2) ("No person shall sell … any butter at retail unless its label bears a statement of the grade … ."); Wis. Stat. § 97.176(1) ("It is unlawful to sell … any butter at retail unless it has been graded."); Wis. Stat. § 97.176(5) ("Butter from outside of the state sold within the state shall be provided with a label … which indicates the grade in a manner equivalent to the requirements for butter manufactured and sold within the state."). The statute is neutral with respect to licensing, too. On its face, the statute allows any individual to apply for a butter-grading license, regardless of whether they reside in-state or out-of-state. *See* Wis. Admin. Code ATCP § 85.07; Wis. Stat. § 97.175(2).

Nor does the statute have a discriminatory effect on interstate commerce. At the outset, it is important to note that many of Minerva's complaints about the law are not specific to out-of-state butter makers and are therefore irrelevant under dormant Commerce Clause analysis. For example, Minerva argues that the butter-grading requirement damages the brand equity of artisanal butter-makers who do not want

to be associated with other commodity butters. But the statute affects *all* artisanal butter-makers in that respect, regardless of whether they reside in Wisconsin or out-of-state. In addition, Minerva complains that employing a permanent Wisconsin-licensed butter grader is "cost-prohibitive for artisanal butter makers like Minerva Dairy." Again, though, both in-state and out-of-state artisanal butter-makers must bear the cost of employing a Wisconsin-licensed butter grader if they want to sell their butter at retail in Wisconsin.[7] Minerva also argues that the statute imposes additional supply-chain costs, such as the cost of creating Wisconsin-specific labels and finding a supplier who will limit shipments to Wisconsin stores. But a similarly situated artisanal butter-maker in Wisconsin—i.e., one that sells interstate and wants to preserve its brand equity—would face exactly the same costs.[8] Therefore, none of these arguments carry any weight under the dormant Commerce Clause, which is "concerned only with regulation that discriminates against out-of-state firms." *Park Pet Shop*, 872 F.3d at 503.

Minerva's best argument is that the statute imposes a disparate cost on out-of-state individuals who apply to become Wisconsin-licensed butter graders. After all, out-of-state applicants must travel to Wisconsin to take the required exami-

---

[7] Alternatively, butter makers may comply with Wisconsin's butter-grading requirement by using the USDA's voluntary grading process. Minerva complains that this is too expensive.

[8] Indeed, in its reply brief Minerva concedes that "[b]ecause a hypothetical artisanal butter maker located in Wisconsin would face similar costs to Minerva Dairy, it is not clear that the law disparately affects out-of-state businesses as required by this Court's precedent."

nation, whereas in-state applicants do not have to travel outside the state. However, we recently rejected a similar argument in *Park Pet Shop*. There, the plaintiffs challenged the Chicago "puppy mill" ordinance, which prohibits pet stores in the city from selling pets that were obtained through commercial breeders. *Id.* at 498. The challengers argued that the ordinance would have a discriminatory effect on out-of-state breeders because Chicagoans would "turn[] directly to breeders for their purebred pets" and would likely "prefer to patronize breeders located closer to the city over those that are farther away." *Id.* at 502–03. We acknowledged that in this respect "the ordinance may confer a competitive advantage on breeders that are not too distant from Chicago." *Id.* at 503. However, we explained that "those breeders are as likely to be located in nearby Wisconsin or Indiana as they are in suburban Chicago or downstate Illinois." *Id.* Therefore, this effect of the ordinance did not constitute impermissible discrimination against *out-of-state* breeders under the dormant Commerce Clause. *See id.* Wisconsin's butter-grading law similarly confers a competitive advantage on applicants who live closer to testing locations like the Department or the University of Wisconsin. But this geographical fact of life does not constitute discrimination against out-of-state applicants. For example, as defendants point out, "[a] would-be grader who lives in Superior [Wisconsin] faces a greater burden than an applicant living just north of Chicago." Therefore, as the district court concluded, Wisconsin's butter-grading statute "discriminates against long-distance commerce," but it does not categorically discriminate against *out-of-state* commerce. As a result, "the dormant Commerce Clause does not come into play and *Pike* balancing does not apply." *See Park Pet Shop*, 872 F.3d at 502.

Finally, Minerva asks the Court to declare that the Department's pre-April 2017 enforcement of the butter-grading law was unconstitutional. Again, Minerva claims that, prior to the filing of this lawsuit, the Department would not allow Wisconsin-licensed graders to grade butter at out-of-state facilities. The district court held that Minerva waived this argument because it "did not adduce any evidence or make any argument concerning the pre-April 2017 understanding." As evidence that such a policy existed, Minerva pointed to Department official Peter Haase's deposition testimony. When asked about whether there was an "unwritten policy" with respect to out-of-state butter graders prior to 2017, Haase responded: "I can't speak definitively to what may or may not have been allowed prior to my tenure as bureau director, but I would have to agree that prior to 2017 there may have been a nonwritten understanding that individuals outside of Wisconsin could not hold a Wisconsin butter-graders license." Given his claimed lack of knowledge about policies in place before his tenure and his use of the word "may," however, Haase's deposition testimony cannot fairly be read as an admission that such a policy existed.[9] We, therefore, agree with the

_____

[9] In its summary judgment motion, Minerva also pointed to declarations its counsel submitted with its preliminary injunction briefing regarding counsel's conversation with Mike Pederson, a food sanitarian-grader for the Department. Plaintiffs' counsel declared that Pederson advised her on a phone call prior to the filing of this lawsuit that the Department does not allow Wisconsin-licensed graders to grade butter at out-of-state facilities. Pedersen responded in his own declaration that he misunderstood counsel's question to be whether the Department permitted its butter graders to travel out of state to grade butter at out-of-state facilities. He clarified that while the Department does not send the graders it employs out of state, the Department allows Wisconsin-licensed butter graders to

district court that Minerva did not present evidence that the Department had such a discriminatory policy prior to April 2017.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

be employed out of state and that such a grader could grade Minerva's butter under Wisconsin's requirements. Minerva did not directly ask Pederson about this issue in his deposition, which occurred subsequent to these declarations, but Pederson testified consistently with his declaration that state law prevented him from visiting out-of-state butter plants. Thus, this evidence also fails to establish that, prior to this lawsuit, the Department had an unwritten policy of preventing Wisconsin-licensed butter graders from grading out-of-state butter.