**L.P., by and through his Next Friend, Tenyiah Patterson, et al., Plaintiffs-Appellants,**

v.

**MARIAN CATHOLIC HIGH SCHOOL, et al., Defendants-Appellees.**

No. 16-2856

United States Court of Appeals, Seventh Circuit.

Argued January 18, 2017

Decided March 29, 2017

Mary Johanna Grieb, Attorney, Shiller Preyar, Chicago, IL, for Plaintiffs–Appellants.

Andrew Kopon, Jr., Attorney, Kopon Airdo LLC, Chicago, IL, D. Faye Caldwell, Attorney, Caldwell Everson PLLC, Houston, TX, for Defendants–Appellees.

Before WOOD, Chief Judge, and POSNER and HAMILTON, Circuit Judges.

WOOD, Chief Judge.

Marian Catholic High School has a policy of subjecting its students to random drug tests. Although it is run by the Catholic Archdiocese of Chicago, it receives federal funds to cover the cost of this program. Students who test positive for illegal drugs are subject to a range of sanctions, from counseling to expulsion.

The plaintiffs in this case are seven Marian students who received false positive results in the school-ordered tests. Six of them are African-American, and one is White. They have sued because they believe that the drug-testing program is being run in a way that discriminates against them on the basis of their race, in violation of both the Constitution and various federal statutes. The district court dismissed the complaint for failure to state a claim, and later, after plaintiffs passed up the opportunity to file an amended complaint, dismissed the action with prejudice. Our own review of the complaint reveals nothing that would support a claim of racial discrimination or a violation of any of the statutes plaintiffs invoke. We therefore affirm.

I

Because of the procedural posture of the case, the account of the facts that follows takes them in the light most favorable to the plaintiffs. Like many high schools, Marian, which is owned and operated by the Dominican Sisters, strives to maintain a drug-free environment for its students. One mechanism it uses is random drug testing. Its methodology involves taking a hair sample from the student to be tested and sending the sample for analysis to a company called Omega Laboratories. Joanna Drackert, a guidance counselor, was responsible for running the program at the time of the events giving rise to this suit. Over the course of a school year, every student at Marian is tested at least once.

Marian is registered with the Illinois State Board of Education and operates in Cook County, Illinois. In connection with its registration, it makes a commitment to comply with all nondiscrimination laws. It also receives various benefits from the state, including recognition of its programs for purposes of participating in interscholastic sports and contests and recognition of its credentials for the purpose of admission to college, post-secondary, training, and military programs. In 2008, Marian was awarded a federal grant of $84,110 for a school-based drug-testing program; in 2009 it received $149,831 for similar purposes; in 2010 it received $84,878; and in 2011 it received $7,233. All students enter into "contracts" with Marian at the time they are admitted; in those contracts, they agree to participate in the drug-testing

program. (No one makes anything of these supposed contracts, and so we need not consider whether they are formally binding on minors.)

The first plaintiff, I.J., had a hair test analyzed by Omega in September 2015. The results were positive for cocaine and benzoylecgonine. (Benzoylecgonine is the main metabolite of cocaine. See *What is benzoylecgonine*, Reference, at https://www.reference.com/health/benzoylecgonine-811a983d6e2cdadd (last visited Mar. 29, 2017). Most of the Omega tests we describe below revealed both substances, but for the sake of brevity, we refer from this point onward only to cocaine.) Two weeks after providing the sample given to Omega, and just four days after receiving the positive results, I.J. voluntarily underwent a test administered by Dr. Wilburn of Back to Health Chiropractic. The latter test was evaluated by Quest Diagnostics, which found I.J.'s hair and urine to be free of any illegal substances. Although Marian wanted I.J. to undergo further drug tests, it appears that I.J. is still at the school.

On October 26, 2015, plaintiff J.B. was selected for a random drug test. Omega reported that J.B.'s hair had tested positive for cocaine, and so Drackert pulled J.B. out of class on November 5 to inform him of this fact. Drackert questioned J.B. for about an hour about this, and she accused J.B.'s parents of being drug dealers. She also telephoned his parents and told them about the test results. On November 6, he voluntarily submitted to a urine drug test performed by the Franciscan Physician network. That test came back negative for any illegal substances. A few days later, he voluntarily participated in a second test, which was conducted by Dr. Wilburn and evaluated by Quest. The second test confirmed the results of the Franciscan test. Drackert refused to admit that there had been any problem with the

Omega results: on November 23, she stopped J.B. in the hallway and announced (within the hearing of others) that he was still a drug user and that the later test results just meant that the substance(s) had worked their way out of his system.

The outcome for plaintiff J.H. was less favorable. J.H. submitted to two hair tests through Marian in the fall of 2014; Omega found that both were positive for cocaine. Another one in January 2015, also ordered by Marian, was positive for cocaine, although apparently at a lower level. J.H. had one final school-ordered test on March 4, 2015, which was also positive. Five days later, Marian required him to withdraw from the school, in accordance with its substance abuse program. On March 23, his hair was evaluated by Quest, in a test administered by Dr. Wilburn; the results came back negative for both substances.

L.P.'s problems began with a complaint from the school about hair style. On October 21, 2014, L.P.'s hair was tested, but Drackert complained to L.P.'s parents that L.P.'s hair style was interfering with the test, and that if L.P. did not change the style, L.P. would need to undergo four additional drug tests over the next six weeks. Once again, tests conducted by Omega returned positive results for cocaine, and outside tests (this time Advocate Healthcare) were negative. In response, Drackert wrote L.P.'s parents informing them about the results and advising them that L.P. and perhaps his family needed to participate in a substance abuse program. The letter warned that any additional positive drug tests could result in L.P.'s dismissal from the school. After the negative test results from Advocate arrived, L.P.'s parents met with Drackert to discuss the inconsistencies between the tests. During the meeting, Drackert insisted that L.P. was using illegal drugs; L.P. denied the

charge. L.P.'s parents complained to Marian about Drackert, but to no avail. L.P. underwent further drug testing in 2015. The pattern of positive results from Omega and negative results from Advocate continued, and in late September 2015 L.P. was forced to withdraw from Marian.

Plaintiff C.C. has been tested repeatedly for drugs—an average of three times per year. Before 2016, he had passed nine tests ordered by Marian. C.C.'s earlier tests used hair from his leg; they were negative. On January 25, 2016, however, Marian used a sample of hair from his head. At that time, C.C. was wearing his hair in an "afro" style, and portions of his hair were dyed blond. His mother noticed that an unusually large sample of hair had been taken. The January test came back from Omega as positive for cocaine, although C.C. did not use cocaine. C.C.'s mother promptly took him to the University of Chicago for a urine drug test, which came back negative for everything. His mother also went with him to Marian to demand a re-test. Both Marian and Quest took samples of his hair on February 9, 2016; the Marian sample came back positive, and the Quest sample came back negative.

The last of the African-American plaintiffs is J.R., who was tested by Omega in October 2014. At the time of that test, he was wearing his hair in dreadlocks. His test came back positive for cocaine, and so the school compelled him to attend drug counseling classes despite his denial of any involvement with that drug. He, too, was retested—in his case by Redwood Toxicology Laboratory—and the result was negative. Drackert nonetheless accused both J.R. and his family of having drugs at home.

The seventh and final plaintiff is Shane Ratkovich, the only White student in the group. Like his fellow classmates, Ratkovich was given a test and received a false positive from Omega. He followed up with a test from Quest, which was negative. Shortly thereafter, he was tested again by Omega, which again reported positive results (as usual, for cocaine). Without giving Ratkovich an opportunity to contest the Omega results, Marian expelled him from school at the end of his junior year.

After reviewing these allegations carefully, the district court concluded that they did not portray a plausible account of race discrimination. The complaint did not allege that the hair testing had a racially disproportionate impact, either because of anything identifiable about different hair types, or because of differences in technology used or sample processing. It also did not allege that Omega knew the race of the person whose hair it was testing. Moreover, for purposes of the count against Drackert under 42 U.S.C. § 1983, the court found nothing in the allegations indicating that she was a state actor. The fact that the school receives federal funds did not transform either the school or its employees into state actors. See *Rendell-Baker v. Kohn*, 457 U.S. 830, 840–42, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982). The claims under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964 failed for lack of allegations of intentional discrimination. The court observed that "the varied ways in which Drackert treated positive-testing students suggests that the favorable treatment [referenced in the complaint] was not favorable in any material way and was, in fact, consistent with how African-American students were treated." It also rejected several other theories and chose to dismiss the supplemental state claims without prejudice.

After the dismissal, the plaintiffs declined the district court's invitation to amend their complaint, and instead asked for the case to be converted into a dismiss-

al with prejudice, so that they could appeal. The district court granted their request. The plaintiffs now appeal some of their federal law claims.

## II

■ We will discuss the plaintiffs' claims theory-by-theory, because the facts are not specific to any particular claim. We begin with their effort to state a claim against Omega under 42 U.S.C. § 1981, which prohibits only intentional discrimination. See *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). (Plaintiffs seem to have dropped their Title VI arguments against Omega on appeal, but this is of little importance, as the analysis would be the same as it is for section 1981. See *Alexander v. Sandoval*, 532 U.S. 275, 280–81, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).) The plaintiffs assert that Omega should have realized that its testing protocols were flawed and were returning false positives, because later tests undergone by the students in question were negative. But this assumes that Omega knew the races of the students whose hair samples it tested, yet the complaint makes no such allegation. Indeed, it does not allege that Omega was told the races corresponding to each sample, or that Marian reported the race in some other way, or even that anyone told Omega when its results produced an alleged false positive.

Even if we assume that Omega was using poor scientific techniques in its testing, that is a far cry from alleging that it was systematically disadvantaging some sample providers on the basis of race. We note as well that the allegations relating to Ratkovich do not help the cases of the six African-American plaintiffs, even though Ratkovich does not seem to be involved in the section 1981 and Title VI counts. Even putting him to one side, we conclude that

the district court correctly dismissed the section 1981 claims against Omega.

■ Plaintiffs fare no better with their section 1981 and Title VI claims against Drackert, Marian, and the Dominican Sisters. They assert that Drackert's actions after being informed that the positive test results were erroneous can be viewed as evidence of racial animus. Essentially, they argue that the only possible non-discriminatory reaction Drackert and her employer could have had would have been to accept the results of the new tests on the students in question. But no one disputes that Drackert and her superiors had, at a minimum, conflicting test results that needed to be reconciled. Moreover, plaintiffs suggest nothing in the complaint that would link Drackert's reactions to race. The fact that she stood by the Omega test results and disparaged the value of later, "clean" tests has no relation to anyone's race. It suggests only that she had confidence—perhaps unwarranted—in the school's program and Omega's testing procedures. There is no allegation that she tended to credit later negative tests for White students, but not for African-American students. The worst one can say is that she made some troubling remarks about the hairstyles and home life of the African-American students. But these remarks were made in the context of explaining why a later test might fail to reflect the presence of a drug (because, she thought, by that time the drug had "worked its way through the system").

The sole allegation of racially disparate treatment in the complaint has nothing to do with those remarks. The complaint alleges that non-African-American students who tested positive for cocaine "were allowed opportunities to re-test immediately, have hair taken from their legs or other parts of their body (as opposed to their heads) and not immediately sent to drug

counseling and/or not expelled from Marian Catholic High School." But the very same complaint recounts the numerous opportunities to re-test that the African-American students were given, as well as the fact that several of the African-American plaintiffs were referred to counseling rather than being expelled. Finally, it frankly admits that Ratkovich, the White student, was expelled after two positive tests. This is not enough to amount to a plausible allegation that intentional race discrimination lay behind the actions of the school defendants. These claims were thus properly dismissed as well.

■ Finally, the plaintiffs believe that they have satisfied the generous notice-pleading standard found in Federal Rule of Civil Procedure 8, in their allegation that Drackert was a state actor and thus that they can proceed with their section 1983 suit against her.

■ To state the obvious, Marian Catholic High School is a private, sectarian school, not a public school. Its employees, including Drackert, are thus private actors as well, unless something intervenes to give them "state actor" status. And only if that alchemy is performed can such a private person be found liable under section 1983: "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

■ A private person acts under color of state law when she is a "willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). This requires "evidence of a *concerted effort* between a state actor and that individual."

*Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The plaintiff must identify a sufficient nexus between the state and the private actor to support a finding that the deprivation committed by the private actor is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

The plaintiffs in this case have alleged no such link between Drackert (or Marian) and the state, even with respect to the drug-testing program. The fact that Marian is registered with the State of Illinois is not enough to transform it into a state actor. The fact that it receives a modest amount of federal money for the drug-testing program does not do the job either. The Supreme Court held in *Rendell-Baker* that a private school's receipt of public funding and its duty to comply with state regulations was not enough to make it a state actor. 457 U.S. at 840, 102 S.Ct. 2764. In that case, the Court was looking at a private school that received about 90 percent of its funding from the state and federal governments. *Id.* at 832, 102 S.Ct. 2764. Despite that huge share, the court concluded that the school's personnel decisions could not fairly be attributed to the state. See *id.* at 838, 102 S.Ct. 2764. In reaching that conclusion, the Court took four points into account: whether the state funding ordered or encouraged the private action; whether the state contributed to the challenged action; whether the school was performing a "public function"; and whether there was a "symbiotic relationship" between the school and the state. *Id.* at 840–43, 102 S.Ct. 2764.

None of those considerations supports a finding of state action in our case. The funding at issue is federal, not state, funding. Actions on behalf of the federal gov-

ernment might make one a federal actor (though we are not saying such a finding would be warranted here), but that would require an entirely different legal theory. Section 1983 addresses only *state* action. The State of Illinois is not alleged to have anything to do with Marian's drug-testing program, and so there is nothing like the symbiotic relationship the Court mentioned in *Rendell-Baker*. And neither drug testing nor education as a whole falls solely in the province of the state, to the exclusion of private parties. There is nothing in the complaint that would support a finding that Drackert (or Marian or the Sisters) acted with a "badge of authority" from the state. See *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). The district court was thus correct to dismiss these claims for failure to allege the essential element of state action.

### III

Drug-testing programs are sensitive, and we readily accept the proposition that errors can creep into test results. But errors alone do not violate the laws against racial discrimination, without some showing that distinctions (usually intentional, but sometimes based on disproportionate impact) based on race explain what is going on. The operative complaint in this case fails to meet this burden, and some aspects of it also fail for want of a state actor. We therefore AFFIRM the judgment of the district court.