In the

# United States Court of Appeals

## For the Seventh Circuit

No. 18-3316

ALARM DETECTION SYSTEMS, INCORPORATED,
an Illinois corporation, *et al.*,

*Plaintiffs-Appellants,*

*v.*

VILLAGE OF SCHAUMBURG, a municipal
corporation, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-02153 — **Rebecca R. Pallmeyer**, *Chief Judge*.

ARGUED APRIL 8, 2019 — DECIDED JULY 15, 2019

Before WOOD, *Chief Judge*, and SCUDDER and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. This appeal is one of two we decide today regarding the market for commercial fire-alarm services in Chicago's suburbs. The current case takes us to the Village of Schaumburg.

In 2016, Schaumburg passed an ordinance that requires commercial buildings to send fire-alarm signals directly to the local 911 dispatch center. That decision, sensible as it may seem, comes at an economic cost: as implemented, the ordinance threatens to exclude from the market all but one alarm-system provider. This is because the area's dispatch center, Northwest Central Dispatch System ("NWCDS"), has an almost decade-old exclusive arrangement with Tyco Integrated Security, LLC. To send signals to NWCDS, then, local buildings must also use Tyco equipment—or at least that is what Schaumburg has told local building owners.

A few of Tyco's competitors (the "Alarm Companies" or "Companies") see in these facts a profit-driven conspiracy among Schaumburg, NWCDS, and Tyco to centralize the local market for fire-alarm services. The Alarm Companies filed this suit charging violations of constitutional, antitrust, and state tort law. The district court, however, dismissed the case, concluding that the complaint's allegations failed to state a claim.

We agree in large part. With one exception, the claims, and the underlying conspiracy, are not pleaded with enough facts to cross the line from speculative to plausible. We therefore affirm in large part and reverse and remand in part.

## I. Background

This case comes to us on a motion to dismiss, so we draw the following facts from the complaint's well-pleaded allegations.

In Schaumburg, local law requires commercial buildings and apartment complexes to maintain fire-alarm systems. The buildings and complexes—or "accounts," as the parties call

them—contract directly with alarm-system providers to install and maintain the systems. These systems, as a general matter, must comply with the National Fire Protection Association's National Fire Alarm and Signaling Code ("NFPA 72"), a nationwide safety standard.

The logistics of the fire-alarm systems are important to this appeal. Each system has three components: heat and smoke detectors, a panel, and a transmitter. When a detector goes off, it sends an alert to the panel. The panel then connects to the transmitter. Before 2016, the accounts' transmitters would route the signals to one of two places: (1) a central-supervising station run by the alarm-system provider (the "CSS model"); or (2) a remote-supervising station operated by the local emergency dispatch center (the "RSS model"). NWCDS is the dispatch center for Schaumburg. It is an "intergovernmental cooperation," *see* 5 ILCS 220/3, of which Schaumburg is a municipal member.

Both the CSS model and the RSS model comply with NFPA 72. *See NFPA 72: National Fire Alarm and Signaling Code* §§ 3.3.282.1, 3.3.282.3 (2016 ed.). If the parties have arranged for the signal to go to the CSS, a CSS operator will address the signal. If the signal was in fact an alarm signal, and not a trouble or maintenance alert, the CSS calls the dispatch center, which in turn sends help. If, however, the signal goes directly from the account to the RSS, the RSS either contacts the account or sends help. For an RSS to receive signals directly from an account, the RSS must have signal-receiving equipment that is compatible with the account's transmitters.

In 2011, NWCDS and Tyco entered into an agreement for this signal-receiving equipment. NWCDS granted Tyco the "exclusive right to install, own, maintain and service all alarm

signal receiving and processing equipment and systems located at the NWCDS Operations Center and the covered agencies." This exclusive agreement covered Schaumburg, among other areas, and it has a ten-year term with automatic one-year renewals. Per the agreement, Tyco pays NWCDS an administrative fee of $23 per month for each account it connects to the equipment at NWCDS. Before 2016, there were about 50 such accounts in Schaumburg, for which Tyco provided equipment and NWCDS directly monitored. The complaint implies that Schaumburg's other accounts, of which there are more than 1,000, operated under the CSS model.

Things changed in August 2016, when Schaumburg adopted Ordinance No. 16-078. The Ordinance states that "[a]ll new fire alarm and fire suppression systems shall transmit fire, supervisory, and trouble signals to the Village of Schaumburg's designated remote supervising station"—NWCDS—"via a wireless transmitter in accordance with NFPA 72." As the complaint explains, the Ordinance effectively mandates accounts to use the RSS model and "requires all" accounts "to contract with Tyco to obtain" their fire-alarm systems.

Following the Ordinance's adoption, Schaumburg sent a notice (the "Notice," as we will refer to it) in September 2016 to the area's accounts. The Notice cited the Ordinance and advised that "[t]he NWCDS-contracted fire alarm vendor, Tyco Integrated Security, is the authorized installer of the radio equipment required for fire alarm systems monitored by NWCDS." It explained further that Schaumburg had adopted the Ordinance to increase the reliability of fire-alarm monitoring, to eliminate the possibility for transmission delays, and to improve response times. Existing systems, according to the

Notice, had until the earliest of one of three dates to begin sending signals directly to NWCDS through Tyco equipment: "(a) [w]hen an existing contract with a monitoring agency (central station) ends; (b) [w]hen the existing fire alarm equipment is modified or replaced; [or] (c) [p]rior to August 31, 2019," subject to possible extensions. The Notice added that accounts would be charged $81 per month to rent Tyco's radio transmitters and for the monitoring service.

The Ordinance and the Notice were not well received, according to the Alarm Companies. Tyco's fee is about 47 percent higher than its competitors' fees for comparable services, and one account has said that switching to Tyco will cost it more than $7,500 per month. Schaumburg, NWCDS, and Tyco, on the other hand, stand to benefit from the Ordinance and the Notice. The complaint estimates that the reduction in competition will result in a $1,000,000 annual profit for Tyco. Tyco's $23-per-customer fee to NWCDS will then grow, and in turn Schaumburg also profits. The village receives a credit from NWCDS in the amount of the fees Tyco pays NWCDS, and Schaumburg anticipates now receiving more than $300,000 each year.

The Companies filed this suit and sought to enjoin preliminarily the Ordinance's enforcement in March 2017. The complaint brought many claims, including for violations of the Contracts Clause of Article I and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. The complaint also claimed violations of the Sherman Act, 15 U.S.C. §§ 1, 2, the Clayton Act, 15 U.S.C. § 18, and state tort law. The various claims derive from the same theory: Schaumburg, working with NWCDS and Tyco, passed the Ordinance to exclude the Companies from the

market and collect monopoly rents. The Companies also argue (but did not allege) that even if the Ordinance was lawful, the Notice was not. Tyco's competitors can operate in a RSS system, the Companies say, by automatically retransmitting signals from their CSS to the RSS. The Companies add that this court has twice thwarted attempts to concentrate a similar market, in decisions we will explain below. *See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012) (*ADT I*); *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854 (7th Cir. 2013) (*ADT II*).

The district court found the Alarm Companies' claims wanting. It first denied the Companies' motion for a preliminary injunction after a hearing, finding that none of the claims was likely to succeed. The court then offered the Companies a chance to replead. They declined—opting instead to file a motion for reconsideration, which the district court also denied. The defendants moved to dismiss and the court granted those motions, concluding that the Companies had inadequately pleaded their federal claims. *See* Fed. R. Civ. P. 12(b)(6). It held the same with respect to the state-law claims against Tyco, and it relinquished jurisdiction over the remaining state-law claims against Schaumburg and NWCDS. *See* 28 U.S.C. § 1367(c).

The Alarm Companies appeal. We consolidated their case with *Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist.*, No. 18-2926, which concerns a similar market and ordinance. But deciding the appeals requires addressing different legal, factual, and procedural questions, so we issue this opinion independently.

## II. Discussion

The Alarm Companies submit that the district court erred both in denying their request for a preliminary injunction and in granting the motions to dismiss. We review the legal conclusions of a preliminary-injunction denial de novo, as we do a Rule 12(b)(6) dismissal. *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019); *Bd. of Forensic Document Exam'rs, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 830 (7th Cir. 2019). With one exception, which we explain below, our analysis of the motion-to-dismiss decision resolves this appeal.

The requirements for surviving a motion to dismiss are now familiar. The complaint must contain allegations that collectively "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We accept all well-pleaded allegations of fact as true and draw all reasonable inferences in the plaintiffs' favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Legal conclusions do not get the same benefit; those we may disregard. *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). If the well-pleaded allegations plausibly suggest—as opposed to possibly suggest—that the plaintiffs are entitled to relief, the case enters discovery. *Iqbal*, 566 U.S. at 678; *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013). If, however, the allegations fail to raise the right to relief "above the speculative level," dismissal is appropriate. *Twombly*, 550 U.S. at 555. This may be the case, for example, if there is an "obvious alternative explanation" for the complaint's factual allegations. *Iqbal*, 556 at 682; *Twombly*, 550 U.S. at 567; *Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014).

Before asking whether the claims before us pass this test, one issue is worth addressing at the outset. Throughout their briefing, the Companies thematically cite *ADT I* and *ADT II* and insist that this case, like those cases, warrants enjoining a local effort to centralize a market in one provider's hands through an RSS protocol. We disagree.

*ADT I* and *ADT II* concerned the Illinois Fire Protection District Act (the "District Act"). *See* 70 ILCS 705/1 *et seq.* That statute, among other things, permits municipalities to set up a "fire protection district" to provide dispatch services and requires that local systems abide by nationwide standards, like NFPA 72. In *ADT I*, we concluded that NFPA 72 permitted an RSS model, but that the district violated NFPA 72, and thus the District Act, by requiring accounts to purchase radio systems from it or its exclusive partner. 672 F.3d at 500–03; *see also Alarm Detection Sys., Inc. v. Vill. of Hinsdale*, 761 N.E.2d 782, 789 (Ill. App. Ct. 2001) (holding that a village could enact an ordinance "requiring that all fire alarm systems … be tied directly to the Village's fire board"). In *ADT II*, we affirmed the district court's decision that the fire-protection district was not in fact operating in an RSS model. The district was instead routing signals through an intermediary, and that scheme, we held, violated NFPA 72 and by extension the District Act. 724 F.3d at 868–71.

This case is not like *ADT I* or *ADT II*, as a matter of law or fact. Here, unlike in *ADT I* and *ADT II*, the dispatch center has not entered the alarm-service business by requiring accounts to purchase equipment from it. And this case, unlike those cases, concerns only constitutional, antitrust, and state tort law claims. The District Act, which controlled our analysis in *ADT I* and *ADT II*, is not in play here, as there is no fire-

protection district in this case and the Companies have not raised a District Act claim.[1] Facing distinct law and different facts, we see nothing controlling in *ADT I* or *ADT II* on the merits of this appeal.

## A. Contracts Clause Claim

We start with the Companies' Contracts Clause claim. Article I of the Constitution provides that "[n]o state shall … pass any … Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10, cl. 1. This Clause "restricts the power of States to disrupt contractual arrangements" through legislative action. *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018). And it applies equally to municipal ordinances. *St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 148 (1901).

Not all laws that affect contracts are unconstitutional, of course. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240–41 (1978). States and municipalities retain the ability to regulate for the public welfare, even if doing so impacts private arrangements. *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 21 (1977). So to state a Contracts Clause claim, a plaintiff must plausibly allege that: (1) the state law "operated as a substantial impairment of a contractual relationship"; and (2) the state law is not drawn "in an 'appropriate' and 'reasonable' way" that advances "'significant and legitimate public purpose.'" *Sveen*, 138 S. Ct. at 1821–22 (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983)).

---

[1] Indeed, there is no implied right of action in the District Act for the sort of claims the Alarm Companies advance, as we explain further in decision in *Orland Fire*, No. 18-2926.

The first element is context specific. Courts must consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Id.* at 1822; *see also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992). The second element, like many questions in constitutional law, requires a tailoring assessment. "The severity of the impairment measures the height of the hurdle the state legislation must clear." *Spannaus*, 438 U.S. at 245.

### 1. The Contracts Clause Claim Against Schaumburg

Beginning with the Contracts Clause claim against Schaumburg, the Alarm Companies have stated a plausible claim.

The complaint alleges that the Ordinance forces all of the Alarm Companies' customers, totaling more than 1,000, to either cancel or not renew their contracts. Some accounts have already canceled their agreements. The district court rightly accepted that this could amount to a significant impairment on the Companies' contractual rights. But the court then focused on Schaumburg's proffered interests: public safety, and more specifically, reliability, efficiency, and the prevention of signal delays. Deferring to those interests, the court concluded that they justified the possible impairment. That conclusion was premature.

At this stage, it is too soon to know how much deference to afford Schaumburg. We afford "at least some deference," to be sure. *Elliott v. Bd. of Sch. Trs. of Madison Consol. Sch.*, 876 F.3d 926, 936 (7th Cir. 2017); *see also Energy Reserves Grp.*, 459 U.S. at 412–13. But the amount of deference owed "differs depending on" the impairment's severity and the state's self-

interest. *Elliott*, 876 F.3d at 937 (citing *Spannaus*, 438 U.S. at 245; *U.S. Trust Co.*, 431 U.S. at 25–26). The complaint alleges a potentially significant impairment, the early cancellation of contracts, as well as Schaumburg's self-interest, namely, the $300,000 it stands to gain after the Ordinance. Taking those allegations as true, as we must, it follows that the deference owed to Schaumburg may be minimal.

With minimal deference, would Schaumburg's proffered interests justify the Ordinance and the Notice? Again, it is too early to tell. There is no presumption of legislative validity under the Contracts Clause, and it demands more than a legitimate end and a rational means. *See Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (Contracts Clause review is "more exacting" than rational-basis review). The Contracts Clause instead requires "appropriate" and "reasonable" tailoring, and the complaint alleges facts that suggest the Ordinance is not so well tailored: a CSS model is reliable and efficient, the complaint says, and it is NFPA 72's "preferred" supervisory system. The Companies also suggest that even if Schaumburg wants an RSS system for the area, the Companies can still keep their customers. Automatic retransmission is feasible, they claim, but Tyco's position as the exclusive provider forecloses that alternative. Taking those facts as true, there may be "an evident and more moderate course" that would have served Schaumburg's "purposes equally well." *U.S. Trust Co.*, 431 U.S. at 31.

The Alarm Companies therefore *pleaded* a plausible Contracts Clause claim against Schaumburg, because of the favorable inferences we afford to them under a Rule 12(b)(6) analysis. The Companies have not, however, *demonstrated* a likelihood of success on the merits, as required for a preliminary

injunction. *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion, Ind.*, 889 F.3d 432, 437 (7th Cir. 2018); *Lambert v. Buss*, 498 F.3d 446, 452 (7th Cir. 2007) (per curiam). The Alarm Companies appear to recognize as much, making little effort on appeal to argue otherwise.

Sensibly so. The Contracts Clause, as we have said before, is concerned with the "taking away" of "entitlements that predated the change" in legislation. *Underwood v. City of Chicago, Ill.*, 779 F.3d 461, 463 (7th Cir. 2015). In this case, however, many contracts will simply not be renewed—not prematurely canceled—which makes it less likely that the Companies have a reasonable expectation in those contracts after the Ordinance's August 2019 cutoff date. *Accord Dodge v. Bd. of Educ. of City of Chicago*, 302 U.S. 74, 80 (1937) (holding that Contracts Clause challenge failed in the absence of vested contractual rights). The Ordinance, moreover, not only allows for a three-year window from its enactment to its effective date; it also permits accounts with contracts expiring after the August 2019 cutoff to seek an extension. This, then, is not a case of a "sudden, totally unanticipated, and substantial[ly] retroactive" change in the law, with which the Contracts Clause is most concerned. *Spannaus*, 438 U.S. at 248–49.

The Alarm Companies still press that the Ordinance and the Notice are poorly tailored because they preclude automatic retransmission, which, they say, is a less restrictive means of meeting the same safety goals. Yet the Companies themselves admit that automatic retransmission has not been used in Schaumburg to date. The state's important interest in fire safety and the fact that the RSS model is NFPA 72-approved present likely more hurdles for the Alarm Companies. The companies have thus failed to demonstrate a likelihood

of success, even if they adequately pleaded their Contracts Clause claim against Schaumburg.

## 2. The Contracts Clause Claims Against NWCDS and Tyco

The Contracts Clause claims against NWCDS and Tyco are a different story. The Companies cannot state a Contracts Clause claim against these two entities, which, in contrast to Schaumburg, are not alleged to have passed the Ordinance or issued the Notice.

Unlike most constitutional deprivations, there is just one way to violate the Contracts Clause: legislative action. *See Gary Jet Ctr., Inc. v. AFCO AvPORTS Mgmt. LLC*, 863 F.3d 718, 723 (7th Cir. 2017); *Khan v. Gallitano*, 180 F.3d 829, 832 (7th Cir. 1999); *see also Nowicki v. Ullsvik*, 69 F.3d 1320, 1325 (7th Cir. 1995) (the Clause "is directed against legislative action only") (quoting *Barrows v. Jackson*, 346 U.S. 249, 260 (1953)). Contracts Clause liability therefore presupposes legislative power. *See Underwood*, 779 F.3d at 464; *E & E Hauling, Inc. v. Forest Pres. Dist. of DuPage Cty., Ill.*, 613 F.2d 675, 678 (7th Cir. 1980). But nothing alleged suggests that either NWCDS, an intergovernmental cooperation, or Tyco, a private company, have such power, let alone that they themselves passed the Ordinance or issued the Notice.

The Companies believe that NWCDS can be subject to the Contracts Clause because Schaumburg, which does act as a legislative body, is a "member" of NWCDS. The point still remains: the complaint does not allege that NWCDS is "responsible" for Schaumburg's ordinances and notices. *Underwood*, 779 F.3d at 464.

That is equally true for Tyco. There is also another problem with respect to the claim against Tyco. The Companies think Tyco can be held liable under the Contracts Clause for its supposed work in helping to get the Ordinance passed and the Notice issued. This theory runs headlong into the First Amendment and, more specifically, the *Noerr-Pennington* doctrine. *See United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965); *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961). Under the *Noerr-Pennington* doctrine, individuals and corporations have the First Amendment right to petition lawmakers for favorable legislation (so long as their efforts are not a sham or fraudulent). *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014); *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379–83 (1991); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *see also New W., L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("*Noerr-Pennington* has been extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses."). That is, at most, all Tyco is alleged to have done—press Schaumburg to pass an Ordinance that would favor it.

The Alarm Companies nevertheless believe that they can state a Contracts Clause claim against NWCDS and Tyco through a "conspiracy theory" under 42 U.S.C. § 1983. Even assuming that the complaint adequately pleads a conspiracy (which we discuss below), the Companies' position mistakes the scope of a § 1983 suit with liability under the Contracts Clause.

Section 1983, under which the Companies bring their constitutional claims, provides a right of action for constitutional

deprivations that occur "under color of" state law.[2] Thus private actors, like Tyco, cannot usually be sued under § 1983. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). The "conspiracy theory," or the "joint participation doctrine," provides an exception: if a private actor conspires with a state actor to deprive someone's constitutional rights, the private actor may be subject to a § 1983 suit. *E.g.*, *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)); *see also, e.g.*, *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (explaining that there must be a "nexus between" private action and state action); *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015) (discussing the "various tests to use when deciding whether someone is a governmental actor"). But that is all the exception does. It potentially offers a way to bring nongovernment actors into the case under § 1983. It does not expand what the Contracts Clause prohibits.

The "conspiracy theory," therefore, may fix a § 1983 problem for the Companies' claim against Tyco, but it does nothing to resolve the larger Contracts Clause problem—that entities not alleged to have taken legislative action cannot be liable under the Clause. The district court was correct to dismiss the Contracts Clause claims against NWCDS and Tyco.

---

[2] We assume that a Contracts Clause claim may be brought under § 1983, a question that neither the parties nor our caselaw addresses. But we note, as have others, that there is "considerable debate" over the question. *Kaminski v. Coulter*, 865 F.3d 339, 345 (6th Cir. 2017) (holding that a Contracts Clause claim cannot be brought under § 1983); *Crosby v. City of Gastonia*, 635 F.3d 634, 641 (4th Cir. 2011) (same); *but see S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885 (9th Cir. 2003) (per curiam) (holding the opposite).

## B. The Fourteenth Amendment Claims

The Fourteenth Amendment provides several guarantees, including due process and equal protection. The Alarm Companies assert that the Ordinance and the Notice violate both protections. Neither claim has merit.[3]

The Alarm Companies address their due process and equal protections theories together, and we will do the same. As the Companies admit, their claims are not premised on either a fundamental right (for due process purposes) or a suspect classification (for equal protection purposes). So the Ordinance and the Notice pass constitutional muster as long as they have a rational basis. *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997); *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014) (explaining the similarity between rational-basis review in the due process and equal protection contexts). Under rational-basis review, laws need only be rationally related to a legitimate interest. The rational basis does not have to be the one lawmakers actually had in mind; it is enough that the basis is conceivable or imaginable. *Minerva Dairy, Inc. v. Harsdorf*, 905 F.3d 1047, 1053 (7th Cir. 2018); *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1071 (7th Cir. 2013). Adding to that lenient standard, laws challenged under rational-basis review carry a "strong presumption of validity." *Minerva Dairy*, 905 F.3d at 1053.

The complaint does not plausibly allege a claim that can withstand this review. It is beyond dispute that improving fire safety and reducing the chance of signal delays are

---

[3] Because we decide that the Ordinance and Notice are not plausibly irrational, we need not address whether Tyco, a private company, can be subject to liability under § 1983.

legitimate interests. To reach those ends, Schaumburg reasonably adopted an NFPA 72-approved RSS model through the Ordinance. Because Tyco, for five years, had been the exclusive provider of equipment with NWCDS, and understanding, as the complaint indicates, that the accounts' transmitters must be compatible with the NWCDS's equipment, Schaumburg issued the Notice informing the accounts that Tyco was the preferred vendor. Nothing about those facts suggests irrationality on the defendants' part. *See D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013); *Flying J Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008).

The Alarm Companies resist this conclusion. They believe that even if the Ordinance is rational, the decision to issue the Notice and force customers to contract with Tyco was not. The Notice, they say, was irrational because the Companies can operate in an RSS model too, so there was no good reason to exclude them. But the complaint alleges otherwise. While it does allege that the Companies had the "ability to automatically re-transmit alarm signals" to NWCDS, it squarely blames the Ordinance, not the Notice, for expelling the Companies from the market. As the complaint puts it, the "combined effect of the Ordinance and the Exclusive Agreement is that all Commercial Accounts … must contract with Tyco." And it later repeats that the Ordinance "*requires* all Commercial Accounts in Schaumburg to contract with Tyco." The Companies are allowed reasonable inferences, not ones that require us to disregard what they have actually pleaded. *See Holman v. Indiana*, 211 F.3d 399, 405 (7th Cir. 2000).

Even assuming that the Notice, and not the Ordinance, is to blame, the complaint still fails to make out a plausible Fourteenth Amendment claim. The complaint alleges that while

the companies *could* automatically retransmit signals, Tyco had already been in the RSS business and NWCDS's exclusive provider for five years. It would surely be rational for Schaumburg and NWCDS to continue on with their longtime partner in the safety arena rather than take a risk on companies experimenting with new technology. The complaint, therefore, does not plausibly plead irrationality on the defendants' part.

## C. Antitrust Claims

Our antitrust laws forbid several forms of anticompetitive conduct. Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. 15 U.S.C. § 1. Section 2 prohibits monopolization, or the attempt at it, through willful, anticompetitive acts. *Id.* § 2. And Section 7 of the Clayton Act bans mergers or acquisitions that substantially lessen competition or create a monopoly. *Id.* § 18. The Alarm Companies claim, with varying degrees of care, that the defendants have violated all three sections. We find those claims inadequately pleaded.[4]

Start with § 1, where the Alarm Companies devote their focus. Section 1 liability requires an agreement or a conspiracy. *E.g.*, *Twombly*, 550 U.S. at 553; *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 933 (7th Cir. 2018). According to the Companies, Schaumburg, NWCDS, and Tyco "carefully

---

[4] We therefore do not need to consider the alternative grounds for dismissal, namely: whether Schaumburg and NWCDS enjoy state-action immunity from antitrust claims and whether Tyco is protected by the *Noerr-Pennington* doctrine. *But see Omni Outdoor*, 499 U.S. at 383 (holding that there is no "conspiracy" exception to the *Noerr-Pennington* doctrine). We also assume, without deciding, that Schaumburg and NWCDS are legally capable of conspiring.

scripted" a "clear design" to pass the Ordinance and issue the Notice—and then "share in the spoils." The defendants entered into this conspiracy, the Companies submit, knowing that Tyco was "the sole provider of receiving equipment at NWCDS," knowing that the Ordinance and the Notice would make Tyco the "sole provider of all transmission equipment," and knowing that the defendants could then reap the profits of a one-provider market.

For this claimed conspiracy to survive the motion-to-dismiss stage, *Twombly* requires that it be pleaded plausible through allegations of fact. Such allegations usually take one of two forms: (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010); *see also, e.g.*, *Kleen Prods.*, 910 F.3d at 934. Whatever the allegations, the question is the same. Stripped of legal conclusions, does the complaint contain "enough factual matter (taken as true) to suggest that an agreement" to pass the Ordinance and issue the Notice "was made"? *Twombly*, 550 U.S. at 555–56. The answer is no.

The complaint provides no direct allegations of an agreement. As to circumstantial allegations, the complaint pleads only:

- Schaumburg is a municipal member of NWCDS.

- In 2011, NWCDS and Tyco entered into an exclusive equipment-provider relationship, under which Tyco would pay NWCDS a fee for each account it links to NWCDS's RSS.

- In 2016, Schaumburg passed the Ordinance mandating the RSS model, citing fire-safety concerns.

- Shortly after, Schaumburg issued the Notice essentially requiring accounts to obtain Tyco equipment.

- Tyco charges $81 per month to most customers, more than its competitors for what (we assume) are comparable products and services.

- NWCDS will profit, by way of more fee payments from Tyco, as a result of the Ordinance.

- So, too, will Schaumburg, stemming from the credits it receives from NWCDS.

Getting from these allegations to the nefarious conspiracy asserted by the Companies requires a speculative leap, not a reasonable inference. Schaumburg is a home-rule municipality, capable of passing its own regulations and rules. The complaint alleges no facts suggesting that an agreement—as opposed to an independent, legislative decision—led Schaumburg to pass the Ordinance and issue the Notice.

The Alarm Companies, for their part, harp on the profits to the defendants, arguing that such profits suggest a conspiracy. Profits through coordination can be relevant to whether a conspiracy is inferable; when an agreement to resist competition would increase profits, there is a potential motive to conspire. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–92 (1986); *In re Text Messaging*, 630 F.3d at 628. But here, Schaumburg's profits did not depend on conspiring with NWCDS and Tyco. The complaint alleges that Schaumburg and NWCDS have an arrangement by which Schaumburg receives credits from NWCDS based on the sums paid to NWCDS by Tyco. And in 2016, at the time of the

alleged conspiracy, NWCDS and Tyco had been locked into a ten-year exclusive arrangement for at least five years. Schaumburg, therefore, did not need NWCDS and Tyco's agreement to pass the Ordinance, issue the Notice, and collect more credits. With or without a conspiracy, the profits for Schaumburg were the same. The complaint therefore offers no plausible reason for Schaumburg to have conspired with NWCDS and Tyco to pass the Ordinance.

The Alarm Companies also point to emails from May and June 2016, between Schaumburg and NWCDS, and between NWCDS and Tyco, concerning the logistics of setting up an area-wide RSS model. These emails were not pleaded, attached to the complaint, or cited to the district court during the motion-to-dismiss briefing. But even assuming we can consider them, *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012), the emails, like the complaint's allegations, do not suggest a conspiracy. Of course Schaumburg, a municipality, had questions for its subject-matter experts about how to implement an RSS model; that is all the emails reflect. *Accord Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 716 (7th Cir. 2011) (back-and-forth, "unilaterally initiated" emails between the defendants suggested only independent action). Perhaps these communications, like the complaint's allegations, are consistent with a conspiracy. But that is not enough under *Twombly*. 550 U.S. at 554.

The complaint therefore fails to plead a plausible antitrust conspiracy. Because the § 1 claim is inadequately pleaded, the § 2 claim must fail too. Section 2 liability requires willful, anticompetitive conduct. *E.g.*, *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 854 (7th Cir. 2011). The only predicate willful conduct cited by the Companies is the alleged

conspiracy. That conspiracy is not plausibly pleaded, and so neither is the § 2 claim.

A few final points on the Sherman Act claims are worth note. First, the facts alleged might present at least one plausible Sherman Act claim—a challenge to NWCDS and Tyco's exclusive contract. Courts, to be sure, "often approve" of exclusive arrangements. *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004). They have recognized, procompetitive benefits, *e.g.*, *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394–95 (7th Cir. 1984), and contests to win the exclusive contract are protected forms of competition—especially where the contract terms are short, like the one-year renewals between NWCDS and Tyco, *see, e.g.*, *Paddock Publ'ns, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 45 (7th Cir. 1996). Still, exclusive dealing can pose an anticompetitive threat when it forecloses a substantial amount of competition. *Republic Tobacco*, 381 F.3d at 736. The Alarm Companies, however, have chosen not to challenge NWCDS and Tyco's exclusive dealing as anticompetitive, and so we do not address the issue further.

Second, we do not know whether more allegations describing pre-Ordinance discussions among Schaumburg, NWCDS, and Tyco could have pushed the antitrust claims into plausibility territory. (Although we note that *Noerr-Pennington* and state-action immunity problems would persist.) But we need not speculate. The Alarm Companies declined the district court's grant of leave to replead after the preliminary-injunction ruling, even after the court gave them an extension to do so. The Companies opted to file a motion for reconsideration instead, and they have never requested leave to amend. They therefore waived any right to replead. *See,*

*e.g.*, *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018).

Turning to the Clayton Act claims, we find waiver. Section 7 of the Clayton Act makes it unlawful to "acquire … the assets of another person" when that acquisition would "substantially … lessen competition." *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016); 15 U.S.C. § 18. On appeal, the Alarm Companies make a terse argument that the account contracts constitute "assets," such that Tyco's threatened takeover of them should be scrutinized for its anticompetitive effect. They failed entirely to make these arguments below, however. As the district court correctly explained, the Companies failed to "address[ ] their Clayton Act claim in their response" during the motion-to-dismiss briefing. That failure results in waiver, and so we will not address the claim. *E.g.*, *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

**D. State Tort Claim**

The Alarm Companies also alleged tortious interference and unjust enrichment against the defendants. The district court dismissed these claims against Tyco before relinquishing jurisdiction over the claims against Schaumburg and NWCDS for lack of subject-matter jurisdiction. *See* 28 U.S.C. § 1367(c). The Companies briefly challenge the dismissal of the claims against Tyco on appeal.

The district court's decision was again correct. The complaint does not allege "intentional and unjustified interference" with the Companies' account contracts by Tyco. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). It pleads instead that the Ordinance and Notice have forced accounts to Tyco. And as we explained earlier, Tyco is

not plausibly responsible for the passing of the Ordinance or the issuing of the Notice.

### III. Conclusion

Because the district court properly dismissed the majority of the complaint's claims under Rule 12(b)(6), we need not address the Companies' remaining arguments that the district court erred in denying a preliminary injunction. We reverse and remand the district court's dismissal of the Contracts Clause claim against Schaumburg. Otherwise, we affirm the district court's judgment.